UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| TERRY GENE BOLLEA, professionally known as HULK HOGAN,<br><br>Plaintiff,<br><br>v.<br><br>GAWKER MEDIA, LLC aka GAWKER MEDIA; GAWKER MEDIA GROUP, INC. aka GAWKER MEDIA; GAWKER ENTERTAINMENT, LLC; GAWKER TECHNOLOGY, LLC; GAWKER SALES, LLC; NICK DENTON; A.J. DAULERIO; KATE BENNERT; BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT,<br><br>Defendants. | Case No. 8:12-cv-2348-T-27TBM |

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Terry Gene Bollea, professionally known as "Hulk Hogan" ("Mr. Bollea" or "Plaintiff"), by and through his undersigned counsel and pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Rule 4.06 of the Local Rules for the Middle District of Florida, submits this Supplemental Memorandum of Law in Support of Motion for Preliminary Injunction ("Supplemental Memorandum"). While the facts herein are the same as those raised in the initial Motion, this Supplemental Memorandum contains additional relevant legal authority to assist the Court in deciding the Motion for Preliminary Injunction. This Supplemental Memorandum relies upon and incorporates the original Motion papers.

{BC00023864:1}1140732.1



## SUPPLEMENTAL MEMORANDUM OF LAW

I. INTRODUCTION

The central questions raised by the Motion for Preliminary Injunction, and this action generally, are as follows:

1. Does a person have the right to secretly videotape another person engaged in private, consensual sexual relations in a private bedroom?

2. Does a website have the right to post that video showing the person naked and engaged in sexual intercourse, against the person's objections and without his consent?

3. Does the person have the right to a Preliminary Injunction requiring the website to remove that video, and a graphic narrative description of the sexual encounter?

Mr. Bollea submits that the answer to the first two questions is a resounding "No" and the answer to the third question is an equally resounding "Yes." If individuals are permitted to secretly videotape other individuals engaged in the most private, intimate human activities, in their private bedrooms, and if websites are permitted to post those videos (for substantial commercial gain) without the victim's permission, and against his strenuous objections, then the right to privacy ceases to exist. If Mr. Bollea is denied his request for the sex tape at issue to be removed from Gawker.com, then what is there to stop peeping Toms everywhere from videotaping anyone and everyone in their most intimate moments – in their bedrooms, in bathroom stalls, in changing rooms, in doctor's offices, etc. – and posting the footage on websites for all the world to watch?

This case involves one of the most egregious sets of facts imaginable. Mr. Bollea was secretly taped having sexual relations with a woman in a private bedroom. He was unaware that he was being taped, and never consented to the taping or the release of the tape.

Gawker Media somehow gained possession of the tape and edited the most graphic parts of it into a one-minute "highlight reel" (the "Video Excerpts") depicting Mr. Bollea fully naked; showing his sex partner performing oral sex on him; and showing him engaged in sexual intercourse with her.  The footage was not blocked, blurred or obscured in any way by Gawker Media, which created the edited "highlight reel" and also added English subtitles to the video to ensure that viewers did not miss a word of their encounter.  Gawker Media also posted a graphic narrative, describing the sexual encounter in lurid detail.

Mr. Bollea's legal counsel sent multiple cease and desist letters/emails to Gawker Media, yet the website refused to remove the Video Excerpts or the graphic narrative.  A few days later, the owner of Gawker Media, defendant Nick Denton, boasted at Gawker.com about the tremendous financial benefit of Gawker Media's posting of Mr. Bollea's sex tape, as well as another story in which Gawker.com posted topless photos of Kate Middleton, stating that those two postings: "… pushed daily US audience over 1m [over one million daily viewers] – for the first time ever…. Those stories bring the site to new readers."

To date, the Gawker.com webpage that posts the Video Excerpts (the "Gawker Webpage") has been viewed **more than 3.7 million times**.  (Declaration of Charles Harder dated October 30, 2012, ("Harder Decl."), a true and correct copy of which is attached hereto as **Exhibit 1**, at ¶ 4, Exh. C).  People are continuing to visit the Gawker Webpage, which has received more than **96,000 views in the past week alone**. Harder Decl. ¶¶ 3-4, Exhs. B and C.  The graphic narrative description of the sex tape, posted at the Gawker Webpage, states:

- "Hulk [Hogan] must get hard … the woman is eager to make that happen."
- "It is a slow, dutiful blowjob and Hulk is thrusting himself into her mouth to speed up the process… She spits loudly.  She resumes for a few

    seconds, but it appears the spit has worked because Hulk mutters something in a growly sex voice."

- "Then we watch Hulk … roll a condom on to his erect penis which, even if it has been ravaged by steroids and middle-age, still appears to be the size of a thermos you'd find in a child's lunchbox."

- "There is lots of squealing and moaning from her and she says stuff like, 'I want to make you cum' and, 'Your dick feels so good inside me' …. There is light spanking from Hulk done to show he supports her efforts and is close to orgasming."

- "She holds the condom full of Hulk jiz like it's a random dirty sock … Hulk is still coming down from his orgasm and is making quick, loud Tony Soprano wheezes."

Harder Decl., Exh. A. Defendants' posting of the Video Excerpts and the graphic narrative (partially quoted above) is nothing more than "a morbid and sensational prying into private lives" for Defendants' financial gain, which has injured, and continues to injure, Mr. Bollea in his personal and professional reputation, and in his "human dignity and peace of mind."

    Defendants likely will contend that their activities are protected by the First Amendment because the sex tape of Mr. Bollea, a celebrity, is "newsworthy." However, as explained herein, while a news organization reporting **the existence of** a sex tape involving Mr. Bollea may be newsworthy, the **posting of the actual footage** of the sex tape on a website is **not** protected free speech, but rather an invasion of his privacy. If every news story about a peeping Tom included the **actual footage** of the victim in a state of undress and/or engaged in private intimate activities, then the right to privacy would **cease to exist**.

    Moreover, if taping victims like Mr. Bollea are denied a Preliminary Injunction to remove the secretly taped footage of sexual or other private intimate activity from the Internet, then such videos would remain on the website(s) for the pendency of the lawsuit,

which could last more than a year, and the websites posting them would profit from that footage throughout that time. Moreover, the damage to the personal and professional reputation of the victim would be tremendous, because the footage of the private sexual or other intimate activity would be accessible, for a year or more, by the victim's family members (including children and parents), friends, classmates, co-workers, colleagues, bosses, clients, prospective clients, clergy, parishioners, community members, and the public at large throughout the world. Any reasonable person would be mortified.

A line must be drawn between the reasonable reporting of news and the exploitation of privacy invasions that expose the details of private, intimate human activities. The public is entitled to know about newsworthy events, but is not entitled to a "front row seat" in people's private bedrooms, bathrooms, changing rooms, doctor's offices or other such places.

The Gawker Webpage even admits that the Bollea sex tape is private and not intended for public view, stating: "Because the internet has made it easier for all of us to be shameless voyeurs and deviants, we love to watch famous people have sex. We watch this footage **because it's something we're not supposed to see**." Harder Decl., Exh. A. (emph. added).

Defendants' conduct manifests a depraved disregard for Mr. Bollea's privacy rights, and an unauthorized commercial exploitation of his publicity rights. For the reasons discussed herein, and in the Motion, the requested Preliminary Injunction should be issued.

## II. ARGUMENT

### A. Plaintiff Terry Bollea is Entitled to Entry of a Preliminary Injunction

Mr. Bollea is entitled to preliminary injunctive relief if he shows: "(1) a substantial likelihood of success on the merits of the underlying case; (2) the movant will suffer

irreparable harm in the absence of an injunction; (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is not issued; and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002); *Keeton v. Anderson-Wiley*, 664 F.3d 865, 868 (11th Cir. 2011); Local Rule 4.05. If the Court determines this standard has been met as to **any one** of Mr. Bollea's claims, a preliminary injunction should be issued to prevent the continued irreparable harm to him.

B.     **Plaintiff Has a Strong Likelihood of Succeeding on His Claims**

    1.     **Defendants are Continuing to Violate Plaintiff's Right of Privacy by Publicly Disclosing Intimately Private Facts**

"The right of privacy is defined as the right of an individual to be let alone and to live a life free from unwarranted publicity." *Harms v. Miami Daily News, Inc.*, 127 So. 2d 715, 717 (Fla. 3d DCA 1961). To establish a claim for public disclosure of private facts under Florida law, a plaintiff must show that there was (1) a publication, (2) of private facts, (3) that are offensive, and (4) are not of public concern.[1] *Cape Publications, Inc. v. Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989). As discussed below, Mr. Bollea has provided substantial evidence to support each of these elements.

    (a)     **Public Disclosure of Private Facts**

Defendants' posting of the Video Excerpts and the graphic narrative description of the sex tape at the Gawker Webpage is a public disclosure. *See Michaels v. Internet*

---

[1] Florida has adopted the four causes of action comprising invasion of the right to privacy as stated in the restatement. Robert C. Sanchez, *Business Law: Unauthorized Appropriation of an Individual's Name or Likeness—Florida's Appellate Courts and 540.08,* 72 FLA. BAR. J. 57, 57 (1998) (observing that "Florida courts accepted the four general categories noted by Prosser").

*Entertainment Group*, 5 F.Supp.2d 823, 840 (C.D. Cal. 1998) ("distribution of the [sex] Tape [of Pamela Anderson Lee and Bret Michaels] on the Internet would constitute public disclosure"). Any person with an Internet connection can freely access the Video Excerpts and the description posted at the Gawker Webpage. In fact, within the first week after being published, the Video Excerpts and Gawker Webpage had already been viewed more than 2.9 million times. Harder Decl. ¶ 2, Exh. A. Thus, the first element of the test is easily satisfied.

The Restatement (Second) of Torts, which Florida has adopted for privacy violations, states that "[s]exual relations, for example, are normally entirely private matters." Restatement (2d) of Torts, § 652D, cmt. (b) (1977). Numerous cases throughout the United States have similarly found information of a sexual nature to be private. *See, e.g., Michaels*, 5 F.Supp.2d at 840 ("content of the Tape – [plaintiffs] engaged in sexual relations – constitutes a set of private facts..." and "**[s]exual relations are among the most personal and intimate of acts**") (emph. added); *Lewis v. LeGrow*, 258 Mich.App. 175, 188 (2003) (where plaintiff was secretly recorded having sex with defendant in defendant's bedroom **"there is no question that defendant's bedroom meets the required definition of a 'private place' as one from which the general public is excluded"**) (emph. added). The Restatement (Second) of Torts further provides that:

> when a photograph is taken **without the plaintiff's consent in a private place**, or one already made is stolen from his home, the plaintiff's appearance that is made public **when the picture appears in a newspaper** is still a private matter, and **his privacy is invaded**.

Restatement (2d) of Torts, § 652D, cmt. (b) (emph. added). The Restatement, which Florida follows, then sets out an example of a privacy violation that is remarkably similar to the present case:

> A, an undistinguished hardware merchant, is engaged in an **adulterous affair with the wife of one of his friends**. B Magazine buys from private detectives a picture of the pair **in a hotel room** in a state of dishabille and publishes it. ***B has invaded A's privacy***.

*Id.* cmt. (b), illus. 6 (emph. added).[2]

Likewise, here, Defendants have engaged in an invasion of Mr. Bollea's privacy by publishing the Video Excerpts and the graphic narrative description at the Gawker Webpage. The fact that Mr. Bollea was not in his own bedroom, but in the bedroom of his sexual partner, is of no import. *Lewis*, 258 Mich.App. at 188 ("a bedroom in a private home in which a couple engages in intimate relations fulfills the definition of a 'private place'" and "reasonable people engaged in sexual relations in a bedroom of a private home expect to be free from 'surveillance.'"). Thus, Mr. Bollea's right of privacy includes the sexual relations that are the subject of the Video Excerpts and graphic narrative.

### (b) Offensiveness

The Video Excerpts and narrative are manifestly offensive and would make any reasonable person uncomfortable and embarrassed. Defendants enabled everyone in the world with Internet access to take a "front row seat" in the private bedroom to watch Mr. Bollea's sexual encounter first-hand. Moreover, the particular excerpts from the sex tape selected by Defendants, and the particular events that were described in the narrative, are the most offensive events from the sexual encounter: full-frontal nudity of Mr. Bollea; his partner performing oral sex on him; the two engaged in sexual intercourse, etc., without any images being blocked, blurred or obscured in any way. Defendants' conduct therefore meets

---

[2] As discussed in the "Newsworthiness" section below, the fact that Plaintiff is a well-known individual, rather than an undistinguished hardware merchant, does not alter the analysis.

the "offensiveness" part of the analysis. *See Michaels*, 5 F.Supp.2d at 840 (public disclosure of a videotape of private sexual relations "would be objectionable to a reasonable person").

### (c) The Content of the Sex Tape Is Not a Matter of Public Concern

The Eleventh Circuit has recognized that "even public figures, like actresses, may be 'entitled' to keep private 'some intimate details ... such as sexual relations ....'" *Toffoloni v. LFP Publ'g Group, LLC*, 572 F.3d 1201, 1211 (11th Cir. 2009) (citing Restatement (2d) of Torts § 652D, cmt. (h)). While there is no precedent within this Circuit addressing privacy violations in the context of a sex tape, the federal courts in California have confronted a nearly identical set of circumstances in the *Michaels* case. That analysis is instructive. In *Michaels*, plaintiff Bret Michaels, a rock musician from the band *Poison*, and *Baywatch* actress Pamela Anderson Lee, filed a motion for a preliminary injunction to prevent the defendants from publishing a private videotape of plaintiff having sex with Pamela Anderson Lee. *Michaels*, 5 F.Supp.2d at 828-29. Unlike in the current case, however, Michaels and Lee **knew** that the sexual act was being recorded. They did not, however, consent to the distribution of the recording by the defendants. Based on those facts, the court held that Michaels and Lee had satisfied the test for a preliminary injunction with respect to their claims for violation of the right to privacy and publicity. *Id.* at 836-42.

In *Michaels*, the defendants claimed that plaintiffs' status as celebrities somehow diminished their expectation of privacy in their sex life. The court rejected the defense, holding: "[w]hile Michaels's voluntary assumption of fame as a rock star throws open his private life **to some extent,** even people who voluntarily enter the public sphere retain **a**

**privacy interest in the most intimate details of their lives.**" *Id.* at 840 (emph. added). The court further held:

> Because they sought fame, Lee and Michaels must tolerate some public exposure of the fact of their involvement. The fact recorded on the Tape, however, is not that [plaintiffs] were romantically involved, but rather the visual and aural **details of their sexual relations,** facts which are ordinarily considered **private even for celebrities.**

*Id.* (emph. added; citations omitted). The same analysis applies here. Defendants Gawker Media *et al.* did not simply report the arguably newsworthy story that Mr. Bollea was involved in a sex tape; they allowed the world to peer into that private bedroom and watch Mr. Bollea fully naked and having sex.

The *Michaels* court acknowledged that privacy torts are subject to a "newsworthiness privilege." *Id.* at 839. "Newsworthiness is defined broadly to include not only matters of public policy, but any matter of public concern, including the accomplishments, everyday lives, and romantic involvements of famous people." *Id.* The court, however, **refused to apply the newsworthiness privilege to a sex tape**, holding:

> The privilege to report newsworthy information is not without limit. Where the publicity is so offensive as to constitute **a morbid and sensational prying into private lives for its own sake**, it serves no legitimate public interest and is not deserving of protection.

*Id.* at 840 (emphasis added; internal quotations and citations omitted); *see also* Restatement 2d Torts §652D cmt. (h). Moreover, the court found that the utter lack of social value in the videotape, combined with the depth of intrusion into the plaintiff's private affairs, weighed heavily against a finding of newsworthiness. *Michaels,* 5 F.Supp.2d at 841-42.

Here, the Gawker Webpage and Video Excerpts serve no legitimate public interest – they serve only the most prurient and voyeuristic of desires. Defendants' own description of

the sex tape highlights this fact: "… the internet has made it easier for all of us to be **shameless voyeurs and deviants**, we love to watch famous people have sex …. When you see glimmers of sloppy kissing or some shoulder moles or just an earnest, breathy, post-coital 'iluvvvvuuuu...' it becomes mesmerizing." Harder Decl., Exh. A (emphasis added). Moreover, the Gawker Webpage admits that the footage of Mr. Bollea is private and not intended for public view: "We watch this footage **because it's something we're not supposed to see.**" *Id.* Thus, the Gawker Webpage and the Video Excerpts is shameless voyeurism, and nothing more. It is not newsworthy, and any attempt by Defendants to claim it as such would show a lack of understanding or respect for what constitutes "news."

    (d)    **Defendants' Conduct is Also A Felony Under Florida's Video Voyeurism Statute**

While the criminal aspect Defendants' conduct is not being directly adjudicated in this lawsuit, the fact that Defendants' conduct constitutes a **felony** under Florida law further supports the need for injunctive relief. Specifically, the Florida video voyeurism statute provides, in pertinent part:

> (2) A person commits the offense of video voyeurism if that person:
>
> (a) For his or her own amusement, entertainment, sexual arousal, gratification, or profit, or for the purpose of degrading or abusing another person, intentionally uses or installs an imaging device to secretly view, broadcast, or record a person, without that person's knowledge and consent, who is dressing, undressing, or privately exposing the body, at a place and time when that person has a reasonable expectation of privacy;…
>
> (3) A person commits the offense of **video voyeurism dissemination** if that person, **knowing or having reason to believe** that an image was created in a manner described in this section, intentionally **disseminates, distributes, or transfers** the image to another person for the purpose of amusement, entertainment, sexual arousal, gratification, or profit, or for the purpose of degrading or abusing another person.

Fla. Stat. §810.145 (emphasis added).

Defendants' conduct falls squarely within this criminal statute. As described above, Defendants knew or had reason to believe that the sex tape was a secret recording of Mr. Bollea undressing, including fully exposing his private areas, and engaged in sexual relations, in the confines of a private bedroom. Defendants knew that this activity was private and that they should not be watching, let alone disseminating it to the general public. The Gawker Website admits: "[I]t's something we're not supposed to see." Harder Decl., Exh. A. Moreover, Mr. Bollea's legal counsel sent two cease and desist communications to Defendants, and Defendants responded to them. (Declaration of Plaintiff Terry Gene Bollea dated October 15, 2012 ("Bollea Decl."), a true and correct copy of which is attached to Plaintiff's Motion for Preliminary Injunction, Dkt. 5, as Exhibit 1, at ¶¶ 8-9). The letters informed Defendants that Mr. Bollea had been secretly taped, did not consent to any aspect of the video, including its posting at the Gawker.com website, and demanded the immediate removal of the Video Excerpts and Gawker Webpage. Bollea Decl., Exhs. A and B. Defendants refused to comply with the demands and confirmed their refusal in a letter responding to Mr. Bollea's legal counsel. Bollea Decl., Exh. C. Accordingly, Defendants violated, and are continuing to violate, the Florida video voyeurism law, Fla. Stat. §810.145, which constitutes felony conduct. This fact should provide further incentive for the Court to enjoin Defendants' outrageous conduct.

### 2. Defendants are Continuing to Violate Plaintiff's Right of Publicity by Misappropriating Plaintiff's Name and Image for Commercial Gain

To prevail on his right of publicity claim, Mr. Bollea must show that Defendants used his name or image for commercial, trade, or advertising purposes. *Fuentes v. Mega Media*

*Holdings, Inc.*, 721 F. Supp. 2d 1255, 1260 (S.D. Fla. 2010) (citing *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1320 n. 1 (11th Cir.2006)). Mr. Bollea has established that Defendants used his name, image and likeness without his consent. Defendants have never suggested that his consent was ever sought, let alone obtained. The only remaining element for the claim is whether Defendants used Mr. Bollea's name or image for a **commercial purpose**.

Profit and commercial benefit were the sole or predominant purpose for Defendants' posting of the Video Excerpts and the graphic narrative description at the Gawker Webpage. Defendants' business relies upon advertising revenues, which are based on the number of "hits" or "page views" they are able to generate. The more "views" the Gawker Webpage receives (and the Gawker.com site generally), the more advertising revenue. The U.S. District Court for the Southern District of New York recently granted a temporary restraining order against Gawker Media in a copyright infringement lawsuit. The court discussed how Gawker Media posts material to its website "in order to attract viewers to Gawker," and that Gawker's use of material on its website is "commercial in nature" because:

> [T]he copyrighted material was placed alongside links to advertisements. The more clicks those links receive, the more compensation [Gawker] can ask of advertisers. Second, the more visitors Gawker receives because of the posting of the copyrighted material, the more attractive it becomes to potential advertisers on the site and, again, the more compensation [Gawker] can ask of those advertisers.

*HarperCollins Publishers v. Gawker Media*, 721 F. Supp. 2d 303, 306 (S.D.N.Y. 2010).

As a result, Defendants post provocative, obscene and/or outrageous content at their websites for the purpose of generating page views and, in turn, advertising revenue. Harder Decl. ¶¶ 6-8, Exhs. E, F and G. In a 2010 interview, Nick Denton, owner of Gawker Media, admits that his websites' more shocking stories are "***the most cost effective marketing you***

*can possibly do.*" Harder Decl. ¶7. These shocking stories, like the Gawker Webpage and Video Excerpts, are a means to market, advertise, and grow the Gawker Media websites.

On October 15, 2012, Denton posted to Gawker.com an article entitled "**The Purpose of Gawker**" which specifically discusses how the posting of Mr. Bollea's sex tape at Gawker.com drove substantial traffic to the website, and resulting advertising revenues. Harder Decl. ¶ 5, Exh. D. In that article, and in his statements to commenters of the article appearing immediately below, Denton states that the Hulk Hogan sex tape story and the Video Excerpts (along with another Gawker.com story which posted topless photographs of Kate Middleton) "**pushed daily US audience over 1m – for the first time ever…. Those stories bring the site to new readers.**" Harder Decl. ¶5, Exh. D. In that story, Denton discusses its ad revenue model regarding such provocative content, stating: "Gawker's sales and in-house creative teams do not simply land one-off banner campaigns wrapped in jargon and fads like other digital properties. . . .We aspire to real interactive advertising. . . ." *Id.*

Defendants misappropriated Mr. Bollea's name, image, likeness and identity for Defendants' financial gain. This is precisely what the Florida right of publicity laws are intended to prevent. In the *Michaels* case, the District Court granted injunctive relief based on plaintiffs' **right of publicity** claim, as well as their invasion of privacy claim. *Michaels,* 5 F.Supp.2d at 836-39. Both in *Michaels*, and the present case, the defendants misappropriated the plaintiff's name, image and likeness to drive viewers to their website(s) for financial gain. Accordingly, Mr. Bollea is likely to succeed on this claim.

### C. Mr. Bollea is Continuing to Suffer Irreparable Injury

Applicable law describes the second prong for injunctive relief as a "threat" of irreparable injury if the injunction is not granted. Here, there is more than just a threat of harm, the irreparable harm is occurring, and will continue, until injunctive relief is granted.

Many courts have found public disclosure of private sexual content to cause irreparable damage. *See Bosley v. Wildwett.com*, 310 F.Supp.2d 914 (N.D. Ohio 2004) (granting preliminary injunction to local television news anchor to prevent defendant from publicizing a videotape of plaintiff participating in a wet t-shirt contest). *Id.* In finding imminent need to prevent irreparable harm, the Court held:

> The continued dissemination of material in question would likely impinge upon future attempts of [plaintiff] to secure comparable employment. Additionally, without a preliminary injunction, it may become impossible for Plaintiff to minimize lasting damages to her persona.... it is likely that the sooner [plaintiff] is able to regain control of her persona, the more likely she is to be able to turn around her career. Indeed, if the Court allows Defendants to continue using images of [plaintiff] for commercial purposes, it cannot later undue the additional harm caused to Plaintiff's persona. **A preliminary injunction is necessary to prevent immediate and irreparable loss to Plaintiff Bosley – namely, the further eroding of her professional and personal persona**.

*Id.* at 934. Moreover, in granting a preliminary injunction, the *Michaels* court held:

> By definition, an actionable disclosure of private facts must be highly offensive to a reasonable person. The injury inflicted is therefore to the plaintiffs' "human dignity and peace of mind." Although monetary damages are available for such injuries, they are difficult to quantify, and such injuries are to some extent irreparable. Furthermore, the privacy of the acts depicted on the Tape cannot be restored by monetary damages after the Tape becomes public. The nature of the internet aggravates the irreparable nature of the injury.

*Michaels*, 5 F.Supp.2d at 842 (internal citation omitted).

The Southern District of New York found similar irreparable injury resulting from the publication of a nude image of Muhammad Ali:

> …[I]n the course of his public career plaintiff has established a commercially valuable proprietary interest in his likeness and reputation, analogous to the good will accumulated in the name of a successful business entity. To the extent that defendants are unlawfully appropriating this valuable commodity for themselves, proof of damages or unjust enrichment may be extremely difficult. . . . Furthermore, defendants appear not only to be usurping plaintiff's valuable right of publicity for themselves but may well be inflicting damage upon this marketable reputation. As described previously, the 'likeness' of Ali which has been published is a full frontal nude drawing, not merely a sketch or photograph of him as he appears in public. Damages from such evident abuse of plaintiff's property right in his public reputation are plainly difficult to measure by monetary standards.

*Ali v. Playgirl, Inc.*, 447 F.Supp. 723, 726 (S.D.N.Y. 1978).

Defendants acknowledge the strength of Mr. Bollea's professional reputation at the time they posted the Gawker Webpage and Video Excerpts: "[u]p top, you'll see one minute from the 30 minutes of footage taken of 59-year-old Hulk Hogan, **professional wrestler, Real Life American Hero to many**, fucking a woman rumored to be the ex-wife of his best friend." Plaintiff's status as a "professional wrestler, Real Life American Hero" and his ability to exploit his name, his brand, and his reputation is being irreparably damaged by Defendants' continued violation of his publicity rights.

The compounding harm to Plaintiff will not cease until the Video Excerpts and Gawker Webpage are removed from Defendants' website(s) and removed from public view.

### III. CONCLUSION

The standards for issuance of a preliminary injunction having been met, Plaintiff requests that this Court enjoin Defendants from disclosing, disseminating or publishing the Gawker Webpage and the Video, or any excerpts or portions thereof, and enter a Preliminary Injunction in the form attached as **Exhibit 2** to Plaintiff's Motion for Preliminary Injunction.

Respectfully Submitted,

DATED: October 30, 2012

/s/ Kenneth G. Turkel
Kenneth G. Turkel, Esq.
kturkel@bajocuva.com
Florida Bar No. 867233
Christina K. Ramirez
cramirez@bajocuva.com
Florida Bar No. 0954497
BAJO, CUVA, COHEN, & TURKEL, P.A.
100 N. Tampa Street, Suite 1900
Tampa, Florida 33602
Telephone: (813) 443-2199
Facsimile: (813) 443-2193

DATED: October 30, 2012

/s/ Charles J. Harder
Charles Harder, Esq.
California Bar No.
*Pro Hac Vice application pending*
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard, 9th Floor
Los Angeles, Ca 90064-1582
T: (310) 478-4100
F: (310) 479-1422
charder@wrslawyers.com