UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRY GENE BOLLEA professionally
known as HULK HOGAN

      Plaintiff,

                                Case No.: 8:12-cv-02348-JDW-TBM

vs.

GAWKER MEDIA, LLC aka GAWKER
MEDIA, *et al.*

      Defendants.

_____/

## DEFENDANT GAWKER MEDIA, LLC'S OPPOSITION
## TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendant Gawker Media, LLC ("Gawker") respectfully submits this memorandum in

opposition to Plaintiff's Motion for a Preliminary Injunction.[1]  Plaintiff Terry Gene Bollea, also

known as "Hulk Hogan," now asks this Court to invoke its equitable powers to issue a prior

restraint on speech, among the most disfavored types of relief known in American jurisprudence.

Such an order is presumptively unconstitutional, and plaintiff has not made the extraordinary

showing required to justify such relief.  *Nebraska Press Association v. Stuart*, 427 U.S. 539, 559,

560 (1976).  For the reasons set forth below, the Motion should be denied.

## FACTUAL BACKGROUND

Plaintiff, a well-known celebrity, alleges he has devoted substantial efforts to cultivating

a respectable public image.  However, in this action, he complains about the posting on the

---

[1] Three defendants (A.J. Daulerio, Kate Bennert and Blogwire Hungary Szellemi Alkotast Hasznosito KFT) have not been properly served, and plaintiff failed to file proofs of service for them by October 31, 2012 as required by this Court's October 22, 2012 Order denying plaintiff's TRO motion.  The remaining defendants (other than Gawker Media, LLC, the entity which actually published the video at issue) have not committed any of the acts complained of in plaintiff's Complaint, appear not to be subject to this Court's jurisdiction, and expressly preserve their jurisdictional defenses until they respond to the Complaint.  In any event, any effort to enjoin any of the other defendants from continuing to display the video at issue would be fail for the same reasons as set forth herein.

1

Internet of brief excerpts – lasting a total of 101 seconds – of a much longer video of him

cheating on his wife of many years (Linda Hogan) with the wife (Heather Clem) of his best

friend (Bubba the Love Sponge, himself a well-known radio personality, also known as Todd

Alan Clem), with his best friend's blessing.  Compl. ¶¶ 1, 24; Bollea Decl. Ex. D.  He concedes

that Gawker had no part in making the initial tape; indeed, he filed a separate lawsuit in Florida

Circuit Court against the Clems for recording it.  *See* Pl. TRO Mem. Ex. 3 (press release by

plaintiff's publicist and counsel contending that "the Clems created the videotape"); Fugate Decl.

Ex. 1 (state court complaint).  The sexual encounter itself took place in Mrs. Clem's bedroom,

Bollea Decl. ¶ 6, and appears to have been recorded on a home surveillance system.

According to news reports by others, in March 2012, seven months before Gawker posted

the excerpts at issue, the full video was being "shopped,"[2] following which plaintiff publicly

claimed that he had been set up in that video.[3]  In April, photographs from the video were posted

on other Internet websites, some of which suggested at the time that the woman in the video was

indeed Mrs. Clem.[4]  Plaintiff again publicly responded.[5]  In that same time frame, plaintiff

provided an audio interview and, despite his current claims about his public image, admitted that

he had no idea who the woman in the sex tape was because he had sex with a lot of women

during that period – adding, "'During that time, I don't even remember people's names, much

---

[2] *See* http://www.tmz.com/2012/03/07/hulk-hogan-sex-tape/ (all articles attached to Fugate Decl.).  *See also* http://content.usatoday.com/communities/gameon/post/2012/03/hulk-hogans-attorney-issues-sex-tape-warning/1.

[3] *See* http://www.tmz.com/2012/03/07/hulk-hogan-i-had-no-idea-sex-was-being-filmed/.  *See also* http://www.eonline.com/news/299470/hulk-hogan-sex-tape-shop-it-at-your-own-risk; http://www.nypost.com/p/pagesix/hulk_hogan_sex_tape_report_DD91uxbTs9Ux0o6zEQqJ2O; http://www.vh1.com/celebrity/2012-03-07/report-a-hulk-hogan-sex-tape-is-in-existence/.

[4] *See, e.g.*, http://thedirty.com/2012/04/exclusive-hulk-hogan-sex-tape-continued-terry-gene-bollea-sex-tape/ and http://thedirty.com/2012/04/exclusive-hulk-hogan-sex-tape/; *see also* http://www.inflexwetrust.com/2012/04/23/photos-nsfw-wwe-hulk-hogan-sex-tape-images-leaked-online/; http://gossipoverload.com/thank-god-theyre-grainy-hulk-hogan-sex-tape-pics-leaked/.

[5] *See* http://www.tmz.com/2012/04/26/hulk-hogan-sex-tape-pictures/.

less girls.'"[6]  Moreover, in 2009, long before reports of the tape surfaced, plaintiff published an autobiography, *My Life Outside the Ring*, in which he described *inter alia* an affair he had while still married to Linda Hogan, admitting that the details of the affair "became national news."[7]

As a result of these prior reports by other parties, and the interest in the topic fueled by plaintiff himself, by the time Gawker posted its story (which is not itself challenged in plaintiff's Complaint) and accompanying brief excerpts of the video, the full video had already been the subject of widespread public discussion, including by plaintiff.  In fact, while the full video lasts more than 30 minutes, the video excerpts posted by Gawker last a total of one minute and 41 seconds and depict fewer than ten seconds of sexual activity.[8]  The video excerpts begin with Bubba the Love Sponge encouraging his wife and plaintiff to have sex while he waits in another room.  They also depict plaintiff receiving a phone call and deciding not to take it, and principally depict conversations between plaintiff and Mrs. Clem in which plaintiff stated *inter alia*: that he should instead be at home; that he had been working out; that he just ate, felt "like a pig" and was out of breath; and that his son's girlfriend's twin sister had proposed a liaison with plaintiff.[9]

---

[6] *See* http://www.tmz.com/2012/03/07/hulk-hogan-sex-tape-partner-tmz-live/ (includes 4 minute interview).

[7] Fugate Decl. Ex. 2 (excerpts from Hulk Hogan's *My Life Outside the Ring*) at 230-31 ("So on February 28, my affair became national news.  I don't think there's a blog or entertainment show in America that didn't run with the story of Hulk Hogan cheating on his wife.  I was humiliated.  I was angry.  I didn't know what to do.  There was no one to sue – the story was true.  I couldn't even figure out who to be angry with, except for myself for letting it happen in the first place."); *see also id.* at 185 ("Next thing I know, the two of us started kissing.  Not to sound perverted or anything, but it was fantastic.  Here I am in my fifties now, and this was a really attractive thirty-four-year-old woman, with dark hair and a curvaceous body. . . .  It felt good.  It was such an emotional and physical release.  We didn't have sex that night, but it opened the door.  Over the course of the next two months we did have sex, maybe five different times.  That was it.  Linda had no idea.  For a while it had that sort of naughty appeal, like a kid sneaking some chocolate that he's not supposed to have."); http://www.publishersweekly.com/978-0-312-58889-2 (review of *My Life Outside the Ring* that notes the book's attention to plaintiff's infidelity).

[8] *See* http://gawker.com/5948770/even-for-a-minute-watching-hulk-hogan-have-sex-in-a-canopy-bed-is-not-safe-for-work-but-watch-it-anyway.

[9] *Id.*

Following the video's posting, both the Clems and plaintiff appear to have confirmed that the woman appearing in the tape is indeed Mrs. Clem.[10]  Reports about the full video have also noted that, at its conclusion, Bubba the Love Sponge is heard to say to his wife, "'If we ever did want to retire, all we'd have to do is use this footage.'"[11]  Immediately after plaintiff filed his various lawsuits, Bubba the Love Sponge made multiple public statements to the effect that plaintiff himself played a part in the release of the video,[12] and, at the very least, would have certainly been aware that his sexual encounter with Mrs. Clem was being taped, as it was widely known that the Clems had cameras in every room in their house.[13]  Remarkably, after Mr. Clem settled plaintiff's lawsuit against him, he issued a public apology asserting the exact opposite.[14]

At bottom, this case involves exaggerated claims that a "sex tape" – which depicts roughly nine seconds of sexual activity in extremely grainy footage amidst otherwise uneventful conversation – warrants the award of $100,000,000.00, the imposition of a constructive trust, the disclosure of a confidential source, and the entry of a prior restraint in derogation of the First

---

[10] *See* http://www.tmz.com/2012/10/09/hulk-hogan-bubba-the-love-sponge-radio-howard-stern/.

[11] *See* http://www.tmz.com/2012/10/09/hulk-hogan-sex-tape-leaked-bubba-heather-clem-retire/.  *See also* Bollea Decl. Ex. D (quoting plaintiff's counsel asserting that same statement appears at end of full tape).

[12] *See* http://www.eonline.com/news/354384/bubba-the-love-sponge-slams-hulk-hogan-s-sex-tape-lawsuit-blasts-wrestler-as-ultimate-lying-showman (Bubba the Love Sponge reportedly told his radio audience that "his ex-best friend Hulk was in on the sex tape's release from the get go," that plaintiff "was in on the stunt," and that he is "'the ultimate, lying showman,'" adding "'You can't play the victim like that."). *See also* http://www.tmz.com/2012/10/16/bubba-the-love-sponge-hulk-hogan-may-have-leaked-sex-tape/; http://www.radaronline.com/exclusives/2012/10/hulk-hogan-sex-tape-leaked-disgruntled-former-bubba-love-sponge-employee (quoting source saying that "Hulk's 'surprise' at the tape being leaked is a ruse and that he's known about it for years and even had the ability to stop the sale last year," adding, "'Hulk acting all shocked at the release of the tape is crap'"); http://www.tampabay.com/blogs/media/content/bubba-love-sponge-calls-hulk-hogan-hypocritical-fraud-over-sex-tape-lawsuit-morning-radio (reports Clem calling plaintiff a "'hypocritical fraud'" and "accus[ing] Hogan of trying to save his public image and endorsements by trying to appear like the biggest victim").

[13] In a recent interview on the Howard Stern radio program, Bubba the Love Sponge stated that plaintiff would definitely have known about the taping, because it was well-known that the he and his wife had video surveillance cameras constantly recording throughout their home, and plaintiff had previously lived with them during a three month period.  *See* http://www.youtube.com/watch?v=IwPQRPHTMPA at 4:35-5:14.  During the interview, Mr. Stern agreed that all of the Clems' friends knew that everything that happened in that house was recorded, joking that he was worried about staying at their house for just that reason.  *Id.* at 19:00-19:10.

[14] *See* http://www.nydailynews.com/entertainment/gossip/hulk-hogan-settles-sex-tape-lawsuit-article-1.1194557; http://www.scribd.com/doc/111465916/Bubba-Clem-Apology-Letter-10-29-12 (apology letter).

Amendment.  Given that Gawker played no role in recording the original video, the prior

extensive news reporting about it, and the limited excerpts that Gawker posted, plaintiff is not

entitled to such extraordinary relief, and his Motion should be denied in its entirety.

## ARGUMENT

I.    **PLAINTIFF SEEKS AN UNCONSTITUTIONAL PRIOR RESTRAINT.**

The Supreme Court has long emphasized that a request to enjoin a publication – *i.e.*, a

prior restraint – comes to a court with "a heavy presumption against its constitutional validity."

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also New York Times Co. v. United

States*, 403 U.S. 713, 714 (1971) (*per curiam*).[15]  Prior restraints constitute "one of the most

extraordinary remedies known to our jurisprudence" and are universally recognized to be "the

most serious and the least tolerable infringement on First Amendment rights."  *Nebraska Press

Ass'n*, 427 U.S. at 559, 562; *see also CBS, Inc. v. United States District Court*, 729 F.2d 1174,

1177 (9th Cir. 1984) ("the first amendment informs us that the damage resulting from a prior

restraint – even a prior restraint of the shortest duration – is extraordinarily grave").  Indeed,

some two hundred years of unbroken precedent establish a "virtually insurmountable barrier"

against the issuance of just the sort of prior restraint on a media outlet sought here.  *Miami

Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 259 (1974) (White, J., concurring).[16]

---

[15] In this context, prior restraint refers to a preliminary order halting dissemination of content.  *See, e.g.*, *Bank Julius Baer & Co. v. Wikileaks*, 535 F. Supp. 2d 980, 985 (N.D. Cal. 2008) (discussing prior restraint doctrine in context of request to take down existing web postings); *United States v. Carmichael*, 326 F. Supp. 2d 1303, 1304-05 (M.D. Ala. 2004) (order requiring defendant to "take down" a website would constitute an impermissible prior restraint on speech).

[16] The bright-line drawn around prior restraints is so fundamental that a number of Supreme Court opinions have expressed the ban on judicial injunctions against publication as an absolute.  *See, e.g.*, *Patterson* v. *Colorado ex rel. Attorney General*, 205 U.S. 454, 462 (1907) (the main purpose of the First and Fourteenth Amendments "is to prevent all such *previous restraints* against publications as had been practiced by other governments") (internal quotations marks and citations omitted) (emphasis in original); *Grossjean* v. *Am. Press Co.*, 297 U.S. 233, 249 (1936) (the First Amendment "meant to preclude the national government . . . from adopting any form of previous restraint upon printed publications, or their circulation").

In *Near v. Minnesota*, 283 U.S. 697, 716 (1931), the Supreme Court emphasized that a prior restraint may be imposed only in "exceptional cases" such as the intended publication of the sailing dates of military transports or the number and location of troops in time of war.  In *New York Times Co. v. United States*, 403 U.S. at 723-24, the Court rejected the government's request to enjoin publication of the Pentagon Papers, which allegedly had been stolen, despite allegations of imminent impairment of the national security.  Because the "dominant purpose" of the First Amendment was to outlaw prior restraints, the Court imposed both a "'heavy presumption against [their] constitutional validity'" and "'a heavy burden of showing justification for the imposition of such a restraint.'"  *Id.* at 714 (quoting *Bantam Books, Inc.*, 372 U.S. at 70, and *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971)); *see also, e.g.*, *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558-59 (1975) ("[t]he presumption against prior restraints is heavier – and the degree of protection broader – than that against limits on expression imposed by criminal penalties").

These First Amendment principles were reaffirmed in 1994 in an action seeking to enjoin the broadcast of a news report that included hidden-camera footage.  In *CBS, Inc. v. Davis*, 510 U.S. 1315 (1994) (Blackmun, J., in chambers), Justice Blackmun wrote:

> Although the prohibition against prior restraints is by no means absolute, the gagging of publication has been considered acceptable only in "exceptional cases."  Even where questions of allegedly urgent national security, or competing constitutional interests, are concerned, we have imposed this "most extraordinary remed[y]" only where the evil that would result from the reportage is both great and certain and cannot be mitigated by less intrusive measures.

*Id.* at 1317 (citations omitted).  *See also Food Lion Inc. v. Capital Cities/ABC, Inc.*, 20 Media L. Rep. (BNA) 2263, 2264, 1992 WL 456652, at *2 (M.D.N.C. Sept. 28, 1992) (refusing to enjoin broadcast of hidden-camera footage despite allegation that "Defendants secured the [videotape]

material in question unlawfully").  As the Sixth Circuit explained, "'[p]rohibiting [publication] is the essence of censorship,' and is allowed only under exceptional circumstances."  *Procter & Gamble Co. v. Bankers Trust Co.*, 78 F.3d 219, 225 (6th Cir. 1996) (quoting *In re Providence Journal Co.*, 820 F.2d 1342, 1345 (1986), *modified on reh'g*, 820 F.2d 1354 (1st Cir. 1987)).  In a case such as this, therefore, "publication must threaten an interest more fundamental than the First Amendment itself" in order to justify a prior restraint.  *Id.* at 227.

Plaintiff appears to argue that the heavy presumption against prior restraints does not apply in this case because Gawker allegedly came into possession of confidential information the creation of which may have constituted a criminal offense.  Quite apart from the fact that Gawker played no part in the creation of the original video, the method by which the media obtains information bears "no relation to the right of [the press] to disseminate the information in its possession" and is not therefore an appropriate basis for entering a prior restraint.  *Procter & Gamble Co.*, 78 F.3d at 224.  This conclusion follows a long line of precedent holding that, even where information has been obtained illegally, a prior restraint is not appropriate.  Instead, remedies for any such alleged misdeeds must be pursued *after* publication or broadcast.  This distinction between "prior restraint" and "subsequent punishment" is based upon a "theory deeply etched in our law," that "a free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them . . . beforehand."  *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. at 558-59; *see also Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 390 (1973) (the "special vice" of a prior restraint is that "communication will be suppressed . . . before an adequate determination that it is unprotected by the First Amendment").

Thus, in *New York Times v. United States*, it was "seemingly uncontested . . . that the [Pentagon papers] . . . were purloined from the government's possession and that the newspapers received them with knowledge that they had been feloniously acquired." 403 U.S. at 754 (Harlan, J., dissenting). Nonetheless, while several members of the six-Justice majority indicated, without deciding, that the newspapers might be subject to post-publication criminal prosecution under federal espionage laws, they emphasized that even unlawful conduct could not justify the imposition of a prior restraint. *See id.* at 733 (White, J., concurring); *id.* at 730 (Stewart, J., concurring); *id.* at 747-48 (Marshall, J., concurring). *See also CBS, Inc. v. Davis*, 510 U.S. at 1318 ("[N]or is the prior restraint doctrine inapplicable because the videotape was obtained through the 'calculated misdeeds' of CBS"). In this case, plaintiff can pursue whatever claims he may have for damages for the dissemination of any information to which he objects. He may not invoke the extraordinary remedy of prior restraint.

That the plaintiff's claim involves an asserted privacy interest makes no difference. For example, the D.C. Circuit vacated a prior restraint banning a cable network from airing videotaped footage of a child using anatomically correct dolls to demonstrate alleged sexual abuse in her therapist's office, despite alleged irreparable harm to the child's privacy interests. *In re Lifetime Cable*, 17 Media L. Rep. (BNA) 1648, 1990 WL 71961, at *1 (D.C. Cir. Apr. 6, 1990) (reversing *Foretich v. Lifetime Cable*, 17 Media L. Rep. (BNA) 1647 (D.D.C. April 6, 1990)). The Court declared that any alleged invasion of her privacy must instead be "redressed in legal actions that do not require a prior restraint in derogation of the First Amendment." *Id.*[17]

---

[17] Other courts have similarly rejected requests for prior restraints based on claimed invasion of privacy in connection with the publication of intimate video or photographs. *See, e.g.*, *Bosley v. WildWetT.com*, 2004 WL 1093037 (6th Cir. Apr. 21, 2004) (issuing stay of preliminary injunction on photographs of plaintiff at "wet T-shirt" contest); *Jones v. Turner*, 23 Media L. Rep. (BNA) 1122, 1995 WL 10611 (S.D.N.Y. Feb. 7, 1995) (refusing to preliminarily enjoin the publication of nude photographs of Paula Corbin Jones in *Penthouse* magazine). Florida courts faced with claims purportedly asserted to protect privacy rights have consistently reached the same conclusion. *See, e.g.*, *In re Branam Children*, 32 So. 3d 673 (Fla. 3d DCA 2010) (order restricting dissemination of

The First Amendment principles articulated in this long and unbroken line of precedent demonstrate that a prior restraint may not properly issue in this case.

## II.   PLAINTIFF CANNOT SATISFY HIS BURDEN OF PROVING HIS ENTITLEMENT TO A PRELIMINARY INJUNCTION IN ANY EVENT.

Even apart from the extraordinary constitutional limitations on prior restraints, to obtain a preliminary injunction, plaintiff must also demonstrate "(1) a substantial likelihood of success on the merits of the underlying case, (2) the movant will suffer irreparable harm in the absence of an injunction, (3) the harm suffered by the movant in the absence of an injunction would exceed the harm suffered by the opposing party if the injunction is not issued, and (4) an injunction would not disserve the public interest." *Johnson & Johnson Vision Care, Inc. v. 1-800-Contacts, Inc.*, 299 F.3d 1242, 1246-47 (11th Cir. 2002).  However, as the Sixth Circuit has emphasized, there is "a fundamental difference between a standard [order] issued under Rule 65 of the Federal Rules of Civil Procedure in a non-speech context and a special injunctive order granting a prior restraint. . . .  [T]he latter . . . is a different beast in the First Amendment context." *Procter & Gamble Co.*, 78 F.3d at 226.  Plaintiff cannot meet his burden of showing he is entitled to such extraordinary relief.

### A.   Plaintiff Is Unlikely To Prevail On The Merits Of His Claims.

Plaintiff cannot demonstrate a likelihood of success on the merits of his claims sufficient to justify the imposition of a prior restraint.

**1.   Intrusion:**  To the extent that plaintiff complains that Gawker's conduct establishes a claim arising under the branch of the privacy tort known as "intrusion upon seclusion," his claim must fail.  The intrusion tort protects only against the physical or electronic

---

photographs of and information about minor children did not overcome strong presumption against prior restraints); *In re Fullwood*, 35 Media L. Rep. (BNA) 1547 (Fla. Cir. 2007) (protecting privacy interests of children did not justify restraint on publishing images of murdered child where similar information had already been released).

invasion of a plaintiff's private space, not against dissemination of information to the public –

the only thing Gawker is alleged to have done here. *See, e.g.*, *Spilfogel v. Fox Broad. Co.*, 433 F.

App'x 724, 726 (11th Cir. 2011) (*per curiam*) ("Under Florida law, . . . tort [of intrusion]

requires intrusions 'into a "place" in which there is a reasonable expectation of privacy.'")

(citation omitted); *Stasiak v. Kingswood Co-Op, Inc.*, No. 8:11-cv-1828-T-33MAP, 2012 WL

527537, at *2 (M.D. Fla. Feb. 17, 2012) (same); *Oppenheim v. I.C. Sys., Inc.*, 695 F. Supp. 2d

1303, 1308 (M.D. Fla. 2010) (same), *aff'd*, 627 F.3d 833 (11th Cir. 2010); *Allstate Ins. Co. v.*

*Ginsberg*, 863 So. 2d 156, 162 (Fla. 2003) (same); *Restatement (Second) of Torts* § 652B cmts.

a-b (basis for intrusion tort is actual physical or electronic intrusion, not subsequent publication).

Moreover, in the context of an application for injunctive relief seeking the removal of content

from a website, such a claim is of no help.  Whatever physical invasion may have occurred in

this case is long since completed; there is no ongoing intrusion by Gawker (or anyone else) to be

restrained.

     **2.**    **Publication of Private Facts:**  As plaintiff concedes, to establish the tort of

publication of private facts, plaintiff must show (a) the publication, (2) of private facts, (3) that

are highly offensive, and (4) that are not of public concern.  *See, e.g.*, *Cape Publ'ns, Inc. v.*

*Hitchner*, 549 So. 2d 1374, 1377 (Fla. 1989) (citing *Restatement (Second) of Torts* § 652D).

Plaintiff's claim fails for at least two independent reasons.  First, the facts were not private at the

time of Gawker's post, but had been widely disseminated prior to that time in both news reports

and photographs.  It is well settled that "[r]epublication of facts already publicized elsewhere

cannot provide a basis for an invasion of privacy claim."  *Heath v. Playboy Enters., Inc.*, 732 F.

Supp. 1145, 1149 (S.D. Fla. 1990); *see also Lee v. Penthouse Int'l Ltd.*, 1997 WL 33384309

(C.D. Cal. Mar. 19, 1997) (no private facts claim for publishing previously disclosed sexually

intimate photographs of Tommy Lee and Pamela Anderson because "there can be no privacy with respect to a matter which is already public") (citation omitted).[18]  Indeed, not only had there been substantial prior reports about the very tape at issue, but those earlier accounts frequently described the acts at issue more graphically than the few seconds of actual sexual activity depicted in the video excerpts posted by Gawker.

Second, plaintiff cannot demonstrate a substantial likelihood of establishing that the video does not involve a matter of public concern.  The Florida Supreme Court has emphasized "that the requirement of lack of public concern is a formidable obstacle" which "has been recognized . . . as being so broad as to nearly swallow the tort." *Hitchner*, 549 So. 2d at 1377. Given the public interest in the contents of the tape, including that it was the subject of numerous prior reports by others *and* prior commentary by plaintiff, he cannot establish a substantial likelihood that the tape does not involve a matter of public concern. *See Eastwood v. Superior Court*, 198 Cal. Rptr. 342, 351 (Cal. App. 1983) ("We have no doubt that . . . the purported romantic involvements" of celebrities – there, details of an alleged "love triangle" involving Clint Eastwood and two other celebrities published in the *National Enquirer* – is a "matter of public concern"); *Restatement (Second) of Torts* § 652D cmt. g (matters of public concern include "news" as "publishers and broadcasters have defined the term" including "matters of genuine, even if more or less deplorable, popular appeal"); *Lee*, 1997 WL 3384309, at *5 ("the sex life of Tommy Lee and Pamela Anderson is . . . a legitimate subject for an article by *Penthouse*" and sexually explicit images of the couple accompanying the article were "newsworthy," especially given prior reports and statements by plaintiffs about their sex lives).

---

[18] By contrast, in *Michaels v. Internet Entertainment Group*, 5 F. Supp. 2d 823 (C.D. Cal. 1998), the Court enjoined further dissemination of another sex tape involving Pamela Anderson where (a) the plaintiffs claimed an ownership in the copyright in the tape and invoked the protections of the Copyright Act, (b) the tape was made in their own home (not as here the home of someone else who might be recording it), (c) the video was sold and images were used to promote it, and (d) the video was much longer than the brief excerpts Gawker displayed.

Particularly in light of the public image plaintiff claims he has cultivated, that he cheated on his own wife with the wife of his best friend – another celebrity – with the friend's blessing and while the friend waited in another room speaks directly to his character and that asserted image.

At bottom, the artificial line that plaintiff seeks to draw between the favorable image he and his publicists have tried to advance and additional information others put forward that might counter that desired image is not one supported by the law; we allow courts and litigants to demarcate that line at our peril.  Indeed, for important societal reasons, "the judgment of what is newsworthy is primarily a function of the publisher, not the courts."  *Heath*, 732 F. Supp. at 1149 n.9.  *See Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d 608, 612-613 (Fla. 5th DCA 2007) (temporary injunction against broadcast including medical records of plaintiff and attorney-client communications with his attorney vacated even where records "are of no obvious public concern"); *Cape Publ'ns, Inc. v. Bridges*, 423 So. 2d 426 (Fla. 5th DCA 1982) (publication of photograph of plaintiff clad only in a dish towel, which illustrated report about abduction and rescue, held to be of legitimate public concern); *see also Florida Star v. B.J.F.*, 491 U.S. 524 (1989) (no liability for reporting identity of rape victim in violation of statute).[19]

**3.    Claims for Infliction of Emotional Distress:**  Plaintiff has not established any likelihood of success with respect to his claim for intentional infliction of emotional distress ("IIED"), a cause of action that "[c]ourts applying Florida law have narrowly construed."  *Liberti v. Walt Disney World Co.*, 912 F. Supp. 1494, 1505-06 (M.D. Fla. 1995); *see also id.* ("[f]ew cases have upheld a plaintiff's pursuit of this cause of action under Florida law").

---

[19] Although plaintiff's Complaint alleges, at ¶¶ 51-59, a cause of action for violation of his common law "right of publicity," he does not invoke that count in seeking a preliminary injunction.  In any event, plaintiff's claim, which is predicated on the contention that Gawker derived a profit from publishing the tape at issue, *see, e.g., id.* ¶ 54, fails as a matter of law.  *See, e.g., Valentine v. CBS, Inc.*, 698 F.2d 430 (11th Cir. 1983) (affirming ruling, as a matter of law, that publisher did not violate right of publicity where defendants did not use plaintiff's name to directly promote a product or service); *Tyne v. Time Warner Entm't Co.*, 901 So. 2d 802 (Fla. 2005) (same).

First, plaintiff cannot show that defendants' conduct was "intentional or reckless" with respect to plaintiff's alleged emotional distress.  Plaintiff's sole contention in that regard is that defendants refused plaintiff's requests not to publish, and, later, to take down, the video excerpts. Pl. Mem. at 5.  But, publishers are regularly subjected to such requests, and plaintiff's theory would expose any publisher who stood on its right to publish to a claim for IIED.  Moreover, in this case, defendants made clear efforts to minimize the potential impact of the publication on plaintiff – editing the 30-minute tape down to less than two minutes (which included only approximately nine seconds of sexually explicit footage).  Such conduct is a far cry from the kind of behavior that Florida courts have found to qualify as intentionally or recklessly causing severe emotional distress.  *See, e.g.*, *Nims v. Harrison*, 768 So. 2d 1198, 1200-01 (Fla. 1st DCA 2000) (defendant threatened to kill teacher and rape her children in student newsletter); *Williams v. City of Minneola*, 575 So. 2d 683, 686 (Fla. 5th DCA 1991) (police officers viewed videotape of autopsy of man who died of an apparent drug overdose at officer's home in a "party atmosphere").

Second, plaintiff has not shown any likelihood that he can establish the publication caused him *severe* emotional distress.  The only proof he offers is his own statement in his Declaration:  the publication "has completely flipped my life upside down, has rattled my current marriage, has been devastating to me and my family, and has caused by [sic] severe emotional distress."  Bollea Decl. ¶ 12.  But these conclusory assertions are insufficient to show a likelihood of success.  *Cf. Saludes v. Republica De Cuba*, 577 F. Supp. 2d 1243, 1254-55 (S.D. Fla. 2008) (plaintiff sufficiently demonstrated that torture of her son caused her severe emotional distress based on detailed affidavit describing, *inter alia*, "insomnia and constant nightmares since her son was imprisoned").  Moreover, what emotional distress plaintiff *does* describe is not

13

properly attributable to defendants.  In the *New York Daily News* article plaintiff attaches as Exhibit D to his Declaration, he attributes his alleged emotional "devastation" to the sense of betrayal he feels toward people he thought were his friends, and to the effect that learning about his behavior had on his new wife – *not* to the publication of excerpts from the tape.

Finally, the Supreme Court has emphasized that, under the First Amendment, a plaintiff faces a very high bar in attempting to penalize expression on the ground that it causes emotional distress.  *See Snyder v. Phelps*, 131 S. Ct. 1207, 1213, 1219 (2011) (rejecting IIED claim brought by parent of deceased soldier against an organization that protested the soldier's funeral with hateful signs); *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 55-57 (1988) (rejecting IIED claim brought by distinguished preacher against publisher of cartoon depicting him as having lost his virginity to his mother in an outhouse).[20]

In this context, it is plaintiff's burden to demonstrate a substantial likelihood of success on the merits of his claims.  For the foregoing reasons, he is unable to do so here.

### B.    Plaintiff Cannot Demonstrate Irreparable Harm.

Plaintiff contends he is entitled to a preliminary injunction because the video excerpts are causing "irreparable injury that cannot adequately be compensated by monetary damages." Compl. ¶¶ 38, 48, 55, 65, 72.  But each of plaintiff's legal theories – for invasion of privacy, violation of the right of publicity, and infliction of emotional distress – contemplate an effective remedy at law, if proven, in the form of money damages.  Economic loss, even if difficult to quantify, is no basis for enjoining the press.  *See, e.g., Hughes Network Sys., Inc. v. Interdigital*

---

[20] Plaintiff has no claim at all for negligent infliction of emotional distress.  As plaintiff concedes, under Florida law, a claim for negligent infliction of emotional must flow from actual physical injuries, which are not alleged here.  *See* Pl. Mem. at 7 (citation omitted); *see also Zell v. Meek*, 665 So. 2d 1048, 1054 (Fla. 1995) ("physical injury" of some kind is an essential element of cause of action).  Because plaintiff cannot state a claim for negligent infliction of emotional distress, he also cannot obtain injunctive relief based on such a claim, and none of the cases he cites holds otherwise.  *See Klay v. United Health Group*, 376 F.3d 1092, 1098 (11th Cir. 2004) ("[I]f the plaintiff's rights have not been violated, he is not entitled to any relief, injunctive or otherwise.").

*Commc'ns Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (noting the "presumption that preliminary injunctions will not issue in cases where the harm suffered may be remedied by money damages at judgment"); *In re King World Prods., Inc.*, 898 F.2d 56, 60 (6th Cir. 1990) (that plaintiff's economic damages may be difficult to quantify is no basis for injunctive relief).

Plaintiff's principal claimed injury is that he "has spent considerable time and effort developing his career as a professional champion wrestler and in developing his brand," and that Gawker's excerpts will have a "detrimental effect" on his "professional life," that he is "likely [to] be viewed negatively by the public," and that he will become "unmarketable." Pl. Mem. at 8. His supporting declaration amplifies this as his primary concern, asserting, "I have spent considerable time and effort developing my career as a professional champion wrestler and in developing my brand." Bollea Decl. ¶ 5. He lists his accomplishments in wrestling, his film and television appearances, and his endorsements for products including: blenders; indoor grills; energy drinks; microwavable hamburgers, cheeseburgers and chicken sandwiches; and nutritional dietary products. *Id.* ¶¶ 3-5; *see also id.* (claiming he has developed his "reputation and international notoriety to create substantial value in [his] identity"). It is well settled, however, that "private litigants' interest in protecting their vanity or their commercial self-interest simply does not qualify as grounds" for keeping information from the public. *Procter & Gamble Co.*, 78 F.3d at 225-26. A claim of prejudicial publicity is insufficient to justify a prior restraint even in the most extraordinary circumstances.[21] Indeed, in *Organization for a Better Austin v. Keefe*, 402 U.S. at 419, the Supreme Court emphasized that "[n]o prior decisions

---

[21] *See CBS, Inc. v. United States District Court*, 729 F.2d at 1176 (vacating an order restraining CBS from "disseminating and/or broadcasting any portion of any and all government surveillance tapes generated in the investigation and prosecution of" John DeLorean); *In re Providence Journal Co.*, 820 F.2d at 1349 (vacating finding of criminal contempt against the *Providence Journal* for publication of allegedly illegally obtained wiretaps); *Hunt v. NBC*, 872 F.2d 289 (9th Cir. 1989) (rejecting injunction based on claim that docudrama's portrayal of murder conviction might prejudice trial on second murder).

support the claim that the interest of an individual in being free from public criticism . . . warrants use of the injunctive powers of a court."  Taking at face value plaintiff's assertion that he has cultivated a public image and reputation, he cannot use that reputation as the legal justification to silence the reporting of information – here, that he cheated on his wife with the wife of his best friend, who is himself a well-known celebrity and who consented to the liaison – that might call into question that carefully orchestrated public persona.[22]

### C.      The Balance of the Harms Favors Gawker.

The third step in the analysis calls for the Court to balance the risk of irreparable harm to the plaintiff against the risk of harm to the defendant.  "In the case of a prior restraint on pure speech, the hurdle is substantially higher [than for an ordinary preliminary injunction]: publication must threaten an interest more fundamental than the First Amendment itself." *Procter & Gamble Co.*, 78 F.3d at 226-27.  Indeed, as the Sixth Circuit recognized when it reversed such a preliminary order, the purpose of such relief is to preserve the status quo. "Where the freedom of the press is concerned, . . . the status quo is to 'publish news promptly that editors decide to publish.  A restraining order *disturbs* the status quo and impinges on the exercise of editorial discretion.'"  *Id.* at 226 (citation omitted) (emphasis added).  "Rather than having no effect, 'a prior restraint, by . . . definition, has an immediate and irreversible sanction'" on the media defendant.  *Id.* (citations omitted); *see also Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) ("The loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury."); *United States v. Quattrone*, 402 F.3d 304, 310

---

[22] Moreover, plaintiff's claimed reputational and psychic injury is at best speculative and is not supported by a shred of actual evidence.  *Holland America Ins. Co. v. Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("[s]peculative injury is not sufficient; there must be more than an unfounded fear on the part of the applicant" to justify the granting of an injunction); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 536 F.2d 730, 736 (7th Cir. 1976) ("One prerequisite for injunctive relief, of course, is irreparable injury, and that injury must be more than speculative.").

(2d Cir. 2005) (Sotomayor, J.) (a "prior restraint is not constitutionally inoffensive merely because it is temporary").

Plaintiff fundamentally misstates defendants' interest as being "only" an "economic" one. Pl. Mem. at 8.  To the contrary, Gawker seeks to vindicate the constitutional principle that publishers, broadcasters and websites need to decide what to publish, not courts or litigants. That plaintiff labels his interests as a "constitutional right of privacy," *see, e.g.*, Compl. ¶¶ 32, and characterizes Gawker's rights as merely economic turns the analysis on its head.  In fact, it is Gawker who has a constitutional right at issue, while any of plaintiff's rights are based on the common law.  *See, e.g.*, *Bartnicki v. Vopper*, 532 U.S. 514, 534 (2001) ("privacy concerns give way when balanced against the interests" protected by the First Amendment); *see also Post-Newsweek Stations Orlando, Inc. v. Guetzloe*, 968 So. 2d at 611-12 ("time after time, when the high court has been called upon to consider whether the free exercise of speech under the First Amendment may be curtailed to protect privacy rights, it has not been hesitant in resolving the ostensible conflict in favor of the exercise of free speech").

### D.     The Public Interest Weighs Against Granting a Preliminary Injunction.

The final consideration is the public interest.  The public has an interest in the free flow of information about public figures, particularly amidst ongoing reports and public statements by plaintiff.  That interest would be curtailed in this case – and chilled in others – by the issuance of a prior restraint.  "This factor weighs heavily in favor of denying the plaintiff's motion.  The public interest lies with the unfettered ability . . . to report" information to the public.  *Religious Tech. Ctr. v. Lerma*, 897 F. Supp. 260, 267 (E.D. Va. 1995) (citing *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 572-73 (1980)).  In this case, the public interest similarly lies with the Gawker's ability to do the same.

This is particularly the case where the contents of the full tape have been described in prior reports and depicted in screen shots, and excerpts of the video has since been posted on many other websites, Compl. ¶ 26, such that injunctive relief against Gawker would be ineffectual.  *See, e.g.*, *Bank Julius Baer & Co. v. Wikileaks*, 535 F. Supp. 2d at 985 (because the documents at issue had been "transmitted over the internet via [other] websites. . . all over the world," court concluded that the "'cat is out of the bag'" and the requested injunction would not "serve its intended purpose") (citation omitted); *In re Zyprexa Prods. Liab. Litig.*, 474 F. Supp. 2d 385, 426 (E.D.N.Y. 2007) ("[p]rohibiting five of the internet's millions of websites from posting the documents will not substantially lower the risk of harm posed to" the complaining party and "would be a fruitless exercise of the court's equitable power"), *aff'd*, 617 F.3d 186 (2d Cir. 2010).

## III.    PLAINTIFF IS NOT ENTITLED TO THE OTHER RELIEF HE SEEKS.

For the reasons above, plaintiff is not entitled to an injunction restricting Gawker's right to publish the contents of the tape, as requested in plaintiff's proposed Order at ¶¶ 1 and 3.

In addition, plaintiff's request in his proposed Order, at ¶ 2, that this Court require defendants to disclose a variety of unpublished information about the video, and the identity of the anonymous source from whom it was received, is equally improper – particularly without citing to any authority demonstrating that such relief is warranted, much less at this preliminary stage of the proceedings.  The information sought – including the identity of defendants' confidential source – is protected by both a statutory journalist's privilege, *see* Fla. Stat. Ann. § 90.5015; N.Y. Civil Rights Law § 79-h, and its constitutional and common law equivalent, *see, e.g.*, *Morris Commc'ns Corp. v. Frangie*, 720 So.2d 230 (Fla. 1998); *O'Neill v. Oakgrove Constr., Inc.*, 71 N.Y.2d 521 (1988).  Under that privilege, to obtain even non-confidential

unpublished information plaintiff must make a "clear and specific" showing that (1) the

information is material to the case; (2) it cannot be obtained from alternative sources; and (3) a

compelling interest exists in its disclosure.  Fla. Stat. Ann. § 90.5015(2)(a)-(c); *see also* N.Y.

Civil Rights Law § 79-h(c) (reciting similar test).  Here, plaintiff has not even attempted to

address this privilege or to make any of the required showings – let alone made them with

sufficient strength to entitle him to such relief at a preliminary stage of the proceedings.  *See,*

*e.g.*, *WTVJ-NBC 6 v. Shehadeh*, 56 So. 3d 104, 106 (Fla. 3d DCA 2011) (reversing trial court's

interlocutory order compelling reporter to identify source of leaked information) (citation

omitted).

Finally, there is no basis for granting plaintiff's request, *see* Proposed Order at ¶¶ 4-5,

that a "constructive trust" be placed on all of defendants' revenues and profits associated with

the challenged publication – while at the same time requesting that he not be required to post a

bond, in direct violation of Federal Rule of Civil Procedure 65(c).  The Supreme Court has made

clear that a district court may not issue a preliminary injunction preventing a defendant from

disposing of its assets in support of a claim for money damages.  *Grupo Mexicano de Desarrollo,*

*S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999).  *See also 1021018 Alberta LTD v.*

*Netpaying, Inc.*, 2011 WL 1103635, at *8 (M.D. Fla. Mar. 24, 2011) (explaining that *Grupo*

*Mexicano* stands for the proposition that, "absent a lien or equitable interest in specific assets, a

district court lacks authority to issue a preliminary injunction preventing disposal of assets

pending adjudication of a claim for money damages"); *see also FTC v. Home Assure, LLC*, 2009

WL 1043956, at *2 n.9 (M.D. Fla. Apr. 16, 2009) (same).

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Respectfully submitted,

THOMAS & LOCICERO PL

By:   /s/ Gregg D. Thomas
    Gregg D. Thomas
    Florida Bar No.: 223913
    Rachel E. Fugate
    Florida Bar No.: 0144029
400 North Ashley Drive, Suite 1100
P.O. Box 2602 (33601)
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
gthomas@tlolawfirm.com
rfugate@tlolawfirm.com

Seth D. Berlin (*pro hac vice* motion pending)
Paul J. Safier (*pro hac vice* motion pending)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone: (202) 508-1122
Facsimile: (202) 861-9888
sberlin@lskslaw.com
psafier@lskslaw.com

Of Counsel:
Cameron A. Stracher
Gawker Media
210 Elizabeth Street, 4th Floor
New York, NY 10012
Telephone:  (212) 743-6513
cameron@gawker.com

               *Counsel for Defendant*
               *Gawker Media LLC*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this 2nd day of November 2012, true and correct copies of

the foregoing Opposition to Plaintiff's Motion for a Preliminary Injunction and supporting

Declaration of Rachel E. Fugate (and exhibits thereto) are being electronically filed and will be

furnished via CM/ECF to:

Kenneth G. Turkel, Esq.
kturkel@BajoCuva.com
Christina K. Ramirez, Esq.
cramirez@BajoCuva.com
Bajo Cuva Cohen & Turkel, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 443-2199
Fax: (813) 443-2193

and served by mail and email on:

Charles J. Harder, Esq.
charder@wrslawyers.com
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard, 9th Floor
Los Angeles, CA 90064-1582
Tel: (310) 478-4100
Fax: (310) 479-1422

David R. Houston, Esq.
dhouston@houstonatlaw.com
432 Court Street
Reno, NV 89501
Tel: (775) 786-4188
Fax: (775) 786-5091

*Attorneys for Plaintiff*

/s/ Gregg D. Thomas
Attorney