# Exhibit 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | |
|---|---|
| TERRY GENE BOLLEA professionally known as HULK HOGAN, | Case No. 8:12-cv-2348 |
| Plaintiff, | |
| v. | |
| GAWKER MEDIA, LLC aka GAWKER MEDIA; GAWKER MEDIA GROUP, INC. aka GAWKER MEDIA; GAWKER ENTERTAINMENT, LLC; GAWKER TECHNOLOGY, LLC; GAWKER SALES, LLC; NICK DENTON; A.J. DAULERIO; KATE BENNERT; BLOGWIRE HUNGARY SZELLEMI ALKOTAST HASZNOSITO KFT, | |
| Defendants. | |

**DECLARATION OF CHARLES J. HARDER**

I, Charles J. Harder, pursuant to 28 U.S.C. § 1746, declare and state as follows:

1.      I am an attorney duly licensed to practice before all courts of the State of

California, and also for the U.S. District Courts for the Central, Southern and Eastern

Districts of California, among other federal courts.  I am a partner at the law firm of Wolf,

Rifkin, Shapiro, Schulman & Rabkin LLP ("WRSSR"), lead counsel for Plaintiff Terry Gene

Bollea, professionally known as Hulk Hogan ("Mr. Bollea" or "Plaintiff").  I have personal

knowledge of the facts set forth herein, and if called as a witness, I could and would

competently testify to the matters stated herein.

2.      Attached hereto as **Exhibit A** is a true and correct copy of the Rights Transfer Agreement between Bubba Clem (aka Bubba the Love Sponge Clem, aka Todd Alan Clem) and Terry Bollea (aka Hulk Hogan).  This exhibit includes two copies of the agreement.  The first copy contains Mr. Clem's signature, and the second copy contains Mr. Bollea's signature.  Exhibit A, which is dated October 25, 2012, and was executed by Mr. Clem on October 26, 2012, indicates that Mr. Clem transferred to Mr. Bollea all of Mr. Clem's "rights, title and interest, including without limitation all copyrights" in, *inter alia*, the "video(s) depicting Terry engaged in sexual relations with Heather Clem" (hereinafter the "Video"), effective as of October 1, 2012.

3.      Attached hereto as **Exhibit B** is a true and correct copy of the Transcript of Preliminary Injunction Hearing Before the Honorable James D. Whittemore United States District Judge, dated November 8, 2012.

4.      Attached hereto as **Exhibit C** is a true and correct copy of the Certificate of Registration for the Video, issued by the United States Copyright Office.  Exhibit C indicates that the registration number for the Video is PAu 3-639-502, and the effective date of the registration is November 3, 2012.

5.      Attached hereto as **Exhibit D** is a true and correct copy of the webpage at the following URL address, as it existed on November 27, 2012:

http://www.amazon.com/America-Heart-Reflections-Family-Faith/dp/B0055X6WHC/ref=sr_1_1?s=books&ie=UTF8&qid=1354062739&sr=1-1&keywords=america+by+heart.  Exhibit D indicates that the book entitled *America by Heart : Reflections on Family, Faith, and Flag*, authored by Sarah Palin, contains three hundred and four (304) pages.

1166466.1                                   2

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 29th day of November, 2012.

Charles J. Harder

Harder Declaration
Exhibit A

EXHIBIT A

### <u>RIGHTS TRANSFER AGREEMENT</u>

For good and valuable consideration set forth in that certain Settlement Agreement between Bubba Clem ("Bubba") and Terry Bollea (p/k/a Hulk Hogan) ("Terry") dated as of October 25, 2012, Bubba hereby transfers to Terry all of Bubba's rights, title and interest, including without limitation all copyrights, trademarks and all other intellectual property rights, in and to any and all videos, audio/visual works, and all related content, depicting Terry in any way, including without limitation all video(s) depicting Terry engaged in sexual relations with Heather Clem (such works, along with the exception stated in the following two sentences, are collectively referred to herein the "Works"). The only exception to this rights transfer will be copyrights in commercially-released videotapes and DVDs that Bubba has published prior to October 1, 2012. Sex tapes and related content are **not** part of this exclusion (Bubba never caused them to be published), and therefore, this Rights Transfer Agreement expressly includes all of Bubba's rights in connection with all sex tapes and related content involving Terry.

Bubba represents and warrants to Terry that he owns all, or at least one half of all, copyrights in and to the Works, and that he has never transferred such rights to anyone, nor licensed to anyone any rights associated with the Works.

This Rights Transfer Agreement is made as of October 1, 2012 (the "Effective Date"), and applies to all rights, title and interest owned or acquired by Bubba from the beginning of time until the present in connection with the Works.

Should Bubba acquire any right, title or interest in or to the Works, or any of them, after the Effective Date, then all such rights, title and interest will automatically revert to Terry, unless Terry expressly states that he does not wish to acquire such rights in a writing signed by Terry.

Bubba agrees to cooperate with Terry in connection with the enforcement of copyrights and trademarks in connection with the Works, including without limitation, signing documentation consistent with the foregoing.

Agreed and accepted:

Bubba Clem aka
Bubba the Love Sponge Clem
aka Todd Alan Clem

10/26/2012

Terry Bollea
aka Hulk Hogan

1138941.1                                    Page 5 of 4

EXHIBIT A

## RIGHTS TRANSFER AGREEMENT

For good and valuable consideration set forth in that certain Settlement Agreement between Bubba Clem ("Bubba") and Terry Bollea (p/k/a Hulk Hogan) ("Terry") dated as of October 25, 2012, Bubba hereby transfers to Terry all of Bubba's rights, title and interest, including without limitation all copyrights, trademarks and all other intellectual property rights, in and to any and all videos, audio/visual works, and all related content, depicting Terry in any way, including without limitation all video(s) depicting Terry engaged in sexual relations with Heather Clem (such works, along with the exception stated in the following two sentences, are collectively referred to herein the "Works"). The only exception to this rights transfer will be copyrights in commercially-released videotapes and DVDs that Bubba has published prior to October 1, 2012. Sex tapes and related content are not part of this exclusion (Bubba never caused them to be published), and therefore, this Rights Transfer Agreement expressly includes all of Bubba's rights in connection with all sex tapes and related content involving Terry.

Bubba represents and warrants to Terry that he owns all, or at least one half of all, copyrights in and to the Works, and that he has never transferred such rights to anyone, nor licensed to anyone any rights associated with the Works.

This Rights Transfer Agreement is made as of October 1, 2012 (the "Effective Date"), and applies to all rights, title and interest owned or acquired by Bubba from the beginning of time until the present in connection with the Works.

Should Bubba acquire any right, title or interest in or to the Works, or any of them, after the Effective Date, then all such rights, title and interest will automatically revert to Terry, unless Terry expressly states that he does not wish to acquire such rights in a writing signed by Terry.

Bubba agrees to cooperate with Terry in connection with the enforcement of copyrights and trademarks in connection with the Works, including without limitation, signing documentation consistent with the foregoing.

Agreed and accepted:

_____          _____
Bubba Clem aka                            Terry Bollea
Bubba the Love Sponge Clem                aka Hulk Hogan
aka Todd Alan Clem

Harder Declaration
Exhibit B

```
 1                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF FLORIDA
 2                       TAMPA DIVISION

 3      TERRY GENE BOLLEA,

 4         Plaintiff,

 5              vs.            CASE NO. 8:12-CV-2348-T-27TBM
                              8 NOVEMBER 2012
 6                            TAMPA, FLORIDA
                              PAGES 1 - 46
 7
        GAWKER MEDIA, LLC, et al.,
 8
           Defendant.
 9
        _____/
10
            TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
11           BEFORE THE HONORABLE JAMES D. WHITTEMORE
                   UNITED STATES DISTRICT JUDGE
12
        APPEARANCES:
13
        For the Plaintiff:  Kenneth George Turkel
14                          Christina K. Ramirez
                            Bajo, Cuva, Cohen and Turkel, PA
15                          Suite 1900
                            100 N. Tampa Street
16                          Tampa, Florida 33602

17      For the Defendant:  Gregg Darrow Thomas
                            Rachel E. Fugate
18                          Thomas & LoCicero PL
                            Suite 1100
19                          400 N. Ashley Drive
                            Tampa, Florida 33602
20
        Court Reporter:     Linda Starr, RPR
21                          Official Court Reporter
                            801 N. Florida Avenue
22                          Suite 13B
                            Tampa, Florida 33602
23

24       Proceedings recorded and transcribed by
        computer-aided stenography.
25
```

1                            I N D E X

2       Plaintiff's argument........................    3
        Defendant's argument........................   26
3       Plaintiff's rebuttal argument...............   35
        Certificate of Reporter.....................   46

4

5                          E X H I B I T S

6         There were no exhibits marked or made a part of this
        record.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              COURTROOM SECURITY OFFICER:  All rise.  This

 2     Honorable Court is now in session, The Honorable

 3     James D. Whittemore presiding.

 4              Be seated, please.

 5              THE COURT:  All right.  Good afternoon.  We're

 6     here for argument on the plaintiff's motion for

 7     preliminary injunction.

 8              Let's first get the appearances of counsel.

 9     For the plaintiff?

10              MR. TURKEL:  Your Honor, for the plaintiff,

11     Ken Turkel and Christina Ramirez of Bajo, Cuva,

12     Cohen and Turkel.

13              THE COURT:  Good afternoon.  And for the

14     defense?

15              MR. THOMAS:  Good afternoon.  Gregg Thomas and

16     Rachel Fugate for Gawker Media, LLC.

17              THE COURT:  Good afternoon.  A couple of

18     housekeeping matters, first of all.

19              Filed -- well, submitted for filing to the

20     clerk earlier today was a document that is entitled,

21     Motion to Intervene by Duane Lee Chapman.

22              I was involved in hearings, and directed that

23     if a pleading is filed, it needs to be docketed.

24              When I had an opportunity to take a look at

25     this particular document, as well as the envelope in
```

1    which it arrived, substantial questions of

2    authenticity arose.  I have, therefore, directed the

3    clerk to remove its image from the public docket.

4    Electronically the lawyers would have received this

5    because it was docketed, and on its face I think you

6    can understand my concerns.

7         I don't know who filed it, whether it's

8    legitimate or not.  But because of its content, it

9    is certainly not something that, if questioned in

10   terms of authenticity, should be in the public

11   domain.

12        I have, therefore -- am, therefore, prepared

13   to deny whatever the document purports to be,

14   construed to be a motion to intervene, because there

15   is simply no legal basis for intervention.

16        I'll handle that administratively.  If there's

17   an objection from anybody, then so be it.

18        But we are here today on the plaintiff's

19   motion.  I have read everything, counsel.  I do not

20   want to dwell on the facts of the case, necessarily,

21   other than to the extent that they may be material

22   to legal issues.

23        But it seems to me, Mr. Turkel, that first and

24   foremost, the plaintiff must overcome the contention

25   that the requested relief constitutes a prior

1     restraint.

2          If it does, it seems to me that that renders

3     somewhat moot the requested relief, at least to the

4     extent it seeks removal of the video clip from the

5     website of Gawker Media.

6          So I'll hear you on that, sir.

7          MR. TURKEL:  Thank you, Your Honor.  May it

8     please the Court.

9          Judge, I don't -- there are some cases that

10    I'm going to refer to that were submitted to the

11    Court in a supplemental memo that was not accepted

12    into the record.  Some of them are cited in defense

13    counsel's memo, also.

14         But we have copies of those here.  And if

15    you're unfamiliar with any of them, I can elaborate

16    on them to some degree.  But there's certainly a lot

17    of case law cited throughout, and I want the Court

18    to be fully advised as to where the citations are or

19    where the cases have been mentioned.

20         Judge, I think at the inception of this, it's

21    important to note a couple of threshold issues, both

22    factual and legal.  And I think the important

23    threshold issue legally -- and this dovetails with

24    Your Honor's request that I address the prior

25    restraint issue -- is if you read the defendant's

1    memoranda carefully and you read the cases cited

2    therein, there's not a case in there that stands for

3    the proposition that the surreptitious,

4    non-consensual video and audio recording of a

5    private sex act in a bedroom and subsequent

6    publication thereof is protected in any valid way by

7    the First Amendment.  To the contrary, Judge.

8          THE COURT:  Let me stop you for a moment.

9          MR. TURKEL:  Sure.

10          THE COURT:  That may be, but there's no

11   allegation that this defendant surreptitiously

12   recorded the video; correct?

13          MR. TURKEL:  Yes.  There is nothing in the

14   record that would support that.  However, there is,

15   obviously, clear and uncontested evidence that they

16   published it.

17          We've brought two separate or three separate

18   torts that are under Florida's right of privacy

19   torts.  One of them would be public disclosure or

20   private facts, the other one intrusion by seclusion.

21          Under the public disclosure or private facts,

22   there's no necessity that Gawker actually take the

23   tape.  To the contrary, the tort is actually meant

24   to protect someone from the publication of something

25   that's private, regardless of how it's obtained.

1            In that respect, Judge, I would also disagree

2      with Gawker's contentions, and I would -- I would

3      direct the Court to read the cases they cited for

4      this contention that the tort of intrusion by

5      seclusion doesn't apply to a publication.

6            Because I've, frankly, read the cases pretty

7      carefully that they cited, and they just don't say

8      what they cite them for.  And I can't be any more

9      direct than that.

10           Frankly, Judge, the most instructive opinion I

11     believe to guide this Court in its decision making

12     today is the *Michaels* opinion versus *IEG*, which is a

13     California opinion and, frankly, based on our

14     research, the only published opinion other than a

15     Michigan appellate court opinion that we could find

16     that was factually on point that dealt with the same

17     claims, the same procedural level of the case, and

18     the same law applicable.

19           And interestingly, Judge, they sort of

20     relegate this opinion that provides more guidance

21     than anything they've cited to a footnote in this

22     halfhearted attempt at distinguishing it by saying

23     it was founded and the holding was based on the fact

24     that there was a copyright claim in there.  And

25     that's just not true, Judge.  It's just not.

1          The *Michaels* court found in a very detailed

2     opinion dealing with celebrity rights to restrain

3     and enjoin the publication of a private sex tape,

4     and in this case, Judge, I would say our facts are

5     even worse because the tape at issue was recorded

6     without the plaintiff's knowledge or consent.

7          Whereas, in the *Michaels* case, the recording

8     was actually consensual.  And they had a copyright

9     claim that was filed -- actually, they perfected

10    their copyrights very shortly before they filed the

11    lawsuit to enjoin the publication of the video.

12         However, everything else about that case is so

13    drastically similar to this case that the fact that

14    it was dumped into a footnote by the defendants and

15    not discussed in any way, shape or form almost

16    accentuates and emphasizes its importance and its

17    applicability.

18         Judge, the *Michaels* case handles virtually

19    every element of the two torts at issue and takes

20    the Court through a very detailed analysis of why

21    the First Amendment protections, which, concededly,

22    Judge, are heightened would not apply.

23         And underlying it, Judge, is this idea that,

24    just because somebody becomes a celebrity, they

25    don't sacrifice their rights to have the most

1    intimate details of their life withheld from

2    public -- publication without their consent.

3         In that respect, Your Honor, Florida's a

4    restatement state, as most of the states are going

5    to adopt the restatement as it relates to the

6    element of these torts.  And so the elements of the

7    Florida tort publication, public disclosure or

8    private facts, are almost identical to the

9    California elements that were at issue in *Michaels*.

10        Moreover, Judge, in reading the *Michaels*

11   opinion, the --

12        THE COURT:  Tell me a little bit about the

13   defendant in that case.  I read the briefs.  But I

14   didn't pull *Michaels*.  I have it up now.  But was

15   the defendant an entity similar to this defendant?

16        MR. TURKEL:  The defendant in that case was

17   *IEG*.  It think it's called Internet Entertainment

18   Group.  It was an adult internet company that

19   published adult movies and similar content, I

20   believe.

21        THE COURT:  For resale?

22        MR. TURKEL:  Not just for resale.  I mean,

23   there was -- there was, I think, a website involved,

24   also.  But they were going to release this tape

25   online, I believe.  And that was what the injunction

1    was -- was sought for in that case.

2          It was barring display of the tape on the

3    internet.  And that's what they sought.  That was

4    the relief that Mr. Michaels sought.  Obviously,

5    Mr. Michaels --

6          THE COURT:  All right.  The distribution of

7    adult entertainment material through a subscription

8    service on the internet.  That's how *IEG* operated,

9    according to the case.  Is that your recollection?

10         MR. TURKEL:  Yes, Judge.  I don't know the

11   mechanics of how you sought display, but it was

12   going to be displayed and published on the internet.

13   Whether it was for free or cost money, I don't

14   believe would be pertinent to the First Amendment

15   aspects of it.  You had access to it, it was

16   published.  And in that respect, I don't think

17   anything in the Court's analysis focused on that.

18         But in analyzing the claims at issue in that

19   case, Judge, they discuss the elements of the tort

20   of intrusion into private affairs and the tort of

21   public disclosure or private facts.

22         And notwithstanding the fact that they found

23   independent grounds for injunctive relief based on

24   the copyright claim, they found a predicate and,

25   indeed, the Court's holding was based on all of

```
 1      these different substantive areas of law.

 2              In analyzing the success of the merits aspect

 3      of it, there were certain things that, obviously,

 4      weren't going to be disputed.  The tape was going to

 5      be disclosed publicly.

 6              Going through the elements of that tort, it

 7      was private facts.  There's an element that requires

 8      it be offensive or objectionable or offensive to the

 9      reasonable person and not a public concern.

10              And the Court at pages -- and I want to get my

11      pages right -- 840 on engaged in its analysis of

12      that.  As a predicate to its reasoning, the Court

13      found that sexual relations are among the most

14      personal and intimate of acts.  The Court is not

15      prepared to conclude that public exposure of one's

16      sexual encounter forever removes a person's privacy

17      interest and all subsequent and previous sexual

18      encounters.

19              In that case, Judge, one of the arguments was

20      that there had been some previously disclosed sexual

21      content, I think, of Ms. Lee.  And even that didn't

22      remove her right even as a celebrity to seek

23      protection from a Court for the un-consented and

24      unauthorized disclosure of what was a consensual

25      sexual tape in that case.
```

1          The Court went on to say that it is also clear

2     that *Michaels* has a privacy interest in his sex

3     life.  While *Michaels*' voluntary assumption of fame

4     as a rock star throws open his private life to some

5     extent, even people who voluntarily enter the public

6     sphere retain a privacy interest in the most

7     intimate details of their lives.

8          And, Judge, what is instructive about the case

9     and what, really, when we cut through -- and, Judge,

10    this isn't to look at the First Amendment as

11    something we talk about flippantly or whimsically.

12    But what the defense has done in their opposition

13    memo is sort of avoided this issue.

14         They've cited numerous cases that stand for

15    axiomatic propositions of First Amendment law, all

16    of which arise from cases that aren't factually

17    similar to what's happened here.

18         And what's happened here is exactly what

19    happened in *Michaels*, which, as best as we could

20    tell, was the only reported decision regarding a sex

21    tape between celebrities.

22         If you look at some of the other cases cited,

23    such as the *Tommy Lee, Pamela Anderson* case, that

24    was still photographs that had been published by

25    three separate media entities by the time they

1    sought injunction.  There's been a contention in

2    this case that, because one or two of these stills

3    got out, that the privacy is waived.  And I don't

4    think that comports at all with what the *Michaels*

5    case was saying.

6         The reality of it is, Judge, is that every

7    court that's discussed the issue of sexual relations

8    behind a closed door has noted that these are among

9    the most intimate and private acts a person can

10   engage in.

11        And even a celebrity who has subjected himself

12   to higher scrutiny of their public and private life

13   enjoys the protection of the courts in cases where

14   that intimate affair, that intimate act is being

15   displayed publicly.  And that's what happened in the

16   *Michaels* case.

17        And the court very notably noted in that case

18   that the private matter at issue here is not the

19   fact that *Lee* and *Michaels* were romantically

20   involved.  Because they sought fame, *Lee* and

21   *Michaels* must tolerate some public exposure of the

22   fact of their involvement.

23        The fact recorded on the tape, however, is not

24   that *Lee* and *Michaels* were romantically involved,

25   but, rather, the visual and oral details of their

1    sexual relations, facts which are ordinarily

2    considered private, even for celebrities.  And they

3    talk about the *Clint Eastwood* case, which is cited

4    throughout those privacy cases.

5         Judge, I think fair game for Gawker or any

6    media entity is to say a public celebrity or a

7    celebrity like Mr. Bollea, Mr. Hogan, is subject to

8    a media entity saying he had an affair, or saying

9    that there's a tape out there that exists.  And

10   those things may be fair game.

11        What is not fair game is to take the details

12   of this intimate private act and display them after

13   being advised two or three times that there was an

14   objection to it and there was going to be a lawsuit.

15        And interestingly, Judge, if you look in the

16   record, Gawker's inhouse counsel responds with this

17   idea that they're going to publish it because it's

18   newsworthy.

19        Now, again, Judge, I'd concede that the fact

20   of a public celebrity like Mr. Hogan having an

21   affair may be newsworthy.  Certainly, the *Eastwood*

22   case was focused on that kind of an inquiry.  The

23   fact that he may have had an affair with a friend's

24   wife may be newsworthy.  The fact that a tape exists

25   may be newsworthy.

1          But, Judge, it's tantamount to allowing a

2     peeping Tom who videos when he goes into someone's

3     window, to stick the videotape out there for the

4     public domain and not worry about the privacy rights

5     of the people he videotaped.

6          It's just simply no different.  It's no

7     different than going to Coca-Cola and, you know,

8     reporting that someone stole their trade secret

9     recipe, but taking it to the next level and then

10     publishing it.  There's just two different levels of

11     conduct in the First Amendment.

12          And it's just -- without trying to weave

13     together inapposite concepts from factual situations

14     that are not similar to this, there is no way to

15     find a case that directly embraces the protections

16     that this Court should grant more appropriately than

17     the *Michaels* case.

18          And they went through a number of the defense

19     arguments.  And, you know, it's even going, you

20     know, to the public concern, which in some respects

21     dovetails with this concept of the newsworthiness

22     privilege.

23          The newsworthiness privilege that exists in

24     defense to both of these torts is what I was just

25     discussing.  And, Judge, again, if this is about

1    reporting, Your Honor, if it's about informing the

2    public that someone has engaged in conduct which is,

3    indeed, newsworthy, then we need to look no further

4    than the narrative that they attached to the video

5    link to see what Gawker's real intention was here.

6         THE COURT:  You mean the narrative that

7    describes what's depicted?

8         MR. TURKEL:  Yes, Judge.  I mean, it is the

9    greatest evidence of -- and it just -- it flies so

10   much in the face of this sort of basking in the

11   First Amendment, because it starts out with this

12   statement, and it's almost --

13        THE COURT:  Well, let me ask you this.  Why

14   should a judge be asked to decide whether what is

15   published was tasteful or not if, indeed, it is

16   protected by the First Amendment?

17        MR. TURKEL:  Judge, I don't think tasteful is

18   the inquiry.  I don't think it's any different --

19   I've seen it compared, that standard, it's

20   objectionable.  And I certainly think in the

21   injunctive relief context, I don't think I've seen

22   many courts that have walked away from making a

23   decision.

24        But I don't think you're going to find many

25   courts that have found the publication of a sex tape

1      taken behind closed doors in a bedroom does not meet

2      that standard.  We cited in that supplement brief

3      this *Lewis* case.

4              THE COURT:  Well, I don't know what you cited

5      in the supplemental --

6              MR. TURKEL:  No.  I know, Judge.

7              THE COURT:  So just tell me a cite if you

8      have --

9              MR. TURKEL:  Yeah.  It's *Lewis* versus -- let

10     me get the exact cite.  It's a Michigan case.  *Lewis*

11     *versus LeGrow,* which is at 258 Mich App 175, 670

12     NW2d 675.  It is a 2003 Court of Appeals case from

13     Michigan.

14              It was another sex tape case, and it had the

15     same type of claims and the same type of inquiry.

16     And, you know, again, Judge, I don't think there are

17     cases out there that are going to support the

18     concept that the act, the taping and dissemination

19     of a private sex act behind closed doors in a

20     bedroom is not going to pass muster as being

21     objectionable.

22              There is -- in the *Michaels* case, there's a

23     string cite, I believe, that I want to take the

24     Court to that actually looks at that particular

25     issue.  But, Judge, before I -- I don't want to lose

1    my train of thought on this idea that trying to

2    claim that this is newsworthy juxtaposed against how

3    they published this just seems to be totally

4    inconsistent factually and legally.

5         The article starts with, because the internet

6    has made it easier for all of us to be shameless

7    voyeurs and deviants, we love to watch famous people

8    have sex.  We watch this footage because it's

9    something we're not supposed to see.

10        Judge, if you juxtaposed that against defense

11   counsel's argument that the video had been shopped,

12   it could lead you to conclude, and, certainly, it's

13   a very reasonable conclusion, that there is a reason

14   why the other places to which it was shopped did not

15   publish it.  And that's because it was illegal.

16        And, you know, I think that there are times

17   when saying something is a matter of public concern

18   would provide a valid defense to this, and maybe the

19   fact of the affair is a matter of public concern.

20   But they didn't publish this video for any reason,

21   Your Honor, other than a lurid, prurient interest in

22   putting this out there because, in their own words,

23   it's something we're not supposed to see.

24        And then if you look -- and I don't want to

25   read this into the record, Judge, but I'm sure

1    you've read the article.  You know, the article

2    engages in vivid, overly vivid, graphic description

3    of sex acts using pornographic metaphor that is

4    meant to be both funny, demeaning and really is

5    meant to attract a reader to the act of sex, not to

6    the fact of any affair Mr. Hogan may have engaged

7    in.

8         And so when you kind of cut through the morass

9    of First Amendment law thrown in the defendant's

10   memo, Your Honor, and it's not that we don't have an

11   appreciation for the protections provided by that in

12   that amendment, you don't see anything that cuts to

13   it and cuts to the inquiry and guides the Court

14   nearly as succinctly and as wisely as the *Michaels*

15   case.

16        And in that respect, Judge, there's not an

17   element that the Court analyzed in *Michaels* that

18   isn't at issue before the Court today.  The torts

19   are relatively identical, because they're

20   restatement based, and Florida follows the

21   restatement.

22        If you read some of the restatement comments

23   on it, you'll find that -- and this is cited both in

24   *Michaels* and in the restatement.  But the privilege

25   to report newsworthy information is not without

1    limit.  Where the publicity is so offensive as to

2    constitute a morbid and sensational prying into

3    private lives for its own sake, it serves no

4    legitimate public interest and is not deserving of

5    protection.

6         Judge, is there any more concise and succinct

7    way to characterize why they put this video up than

8    that?  I mean, you only have to look to their own

9    narrative to corroborate the fact that this is the

10   exact conduct that the restatement contemplated

11   prohibiting.

12        THE COURT:  Does the court in the *Michaels*

13   case discuss whether or not the requested relief

14   would constitute a prior restraint?

15        MR. TURKEL:  Judge --

16        THE COURT:  I didn't see it, but I --

17        MR. TURKEL:  I want to be careful, because

18   there is certainly a discussion in the *Michaels*

19   case.  Let me just -- I want to get to the

20   appropriate language so I don't speak out of turn.

21        But the -- the constitutional concerns are

22   addressed I don't want to say in any one section but

23   throughout, and that is the idea that the relief

24   must be requested narrowly and the balance between

25   the constitutional concerns and a plaintiff's right

```
 1       to privacy under the various torts cited.

 2              And so, yes, I think free speech and free

 3       speech cases are discussed throughout.  And, you

 4       know, whether the words "prior restraint" are

 5       actually used at any one point, I'm sure they are

 6       somewhere in there.  I can't point you to it right

 7       off -- right off the bat here.

 8              But the constitutional cases that are cited

 9       both in defense memo and throughout --

10              THE COURT:  Well, let me ask Mr. Thomas.  Is

11       it discussed?

12              MR. THOMAS:  Yes, Your Honor.

13              THE COURT:  Can you tell me what page?

14              MR. THOMAS:  Your Honor, if you look under it

15       looks like number four.  I'm trying to find the

16       page.  It's --

17              THE COURT:  Headnote four?

18              MR. THOMAS:  It looks like headnote four, Your

19       Honor, entitled necessity of terror relief to avoid

20       invalid prior restraint.

21              MR. TURKEL:  That's actually headnote 22,

22       Judge.  That's where I was at.  Yeah.

23              MR. THOMAS:  Page four -- I mean --

24              THE COURT:  All right.  Hang on just a second.

25       Let me catch up with you.  Just a second.
```

1          (Brief pause.)

2          THE COURT:  All right.  Well, it certainly --

3     the decision certainly included a discussion.

4     Excuse me.

5          MR. TURKEL:  Yes, Judge.  And, you know,

6     again, it's -- there's an awful lot of law cited in

7     the papers before the Court, Judge.  And I don't

8     want the Court to think we're dismissing the idea

9     that throughout the development of our

10    constitutional jurisprudence and First Amendment

11    law, there are not maxims which weigh against prior

12    restraint.  I mean, it's obvious, Your Honor.

13    They've cited the cases.

14          However, in the application of those cases to

15    this case, none of them applies more directly than

16    the *Michaels* case.  It is virtually on point.  It's

17    close to being all fours.

18          I think, Judge, underlying it from the

19    standpoint of --

20          THE COURT:  It's fact specific, is it not,

21    though, Mr. Turkel, regardless?

22          MR. TURKEL:  Well, yeah.  I think so, Judge.

23          THE COURT:  All right.

24          MR. TURKEL:  I mean, I think a lot of these

25    cases are fact specific inquiry.

1          THE COURT:  So in that case we have an entity

2     that is essentially marketing the video as part of a

3     commercial endeavor.  Whereas, in our case, Gawker,

4     as I understand the pleadings and the allegations,

5     is a website that has published a short snippet, if

6     you will, of the entire tape.  And then, of course,

7     the description by words that you've alluded to.

8          But it's not marketing the tape, as I

9     understand it.

10          MR. TURKEL:  Your Honor, my response to that

11     would be -- is the Court finished with its thought

12     on that issue, because --

13          THE COURT:  Well, I think there's a

14     distinction there because this is a fact specific

15     inquiry, and the *Michaels* case begins with a lengthy

16     discussion on the fact that the plaintiff's

17     copyrighted this film, sought copyright protection.

18     And, of course, it segued into First Amendment

19     discussion.

20          The Court certainly was focusing on the fact

21     that *IEG* was marketing this particular -- or

22     attempting to market this particular video.  And it

23     seems to me and my question is, didn't the Court

24     focus somewhat on the fact that the nature of the

25     use was a consideration?

1          MR. TURKEL:  Judge, I don't think you'll find

2     any aspect of the Court's actual legal analysis that

3     focuses on the method or vehicle of publication.

4     There are a number of different legal claims that

5     are analyzed in *Michaels*, the copyright claim, the

6     right to publicity claim, which may include some

7     element of commercial gain, but there's also the

8     public disclosure of private facts claim and the

9     intrusion by seclusion claims, which don't.

10         And I, frankly, don't think you'll find

11    anywhere in the opinion or related cases that say

12    the method of publication, whether you have to go on

13    the website and put in a credit card or whether

14    you're just able to look at it is going to matter.

15         And I certainly don't think there's language

16    in *Michaels* that drives their opinion as it relates

17    to the prior restraint issues and the likelihood of

18    success on the merits and other elements on the tort

19    issues.

20         Moreover, Judge, we've got evidence in the

21    record, I mean, certainly Gawker does not exist for

22    free.  I believe we've put evidence in the record

23    regarding their hits.

24         I don't know whether -- again, I don't want to

25    keep going back to this.  I don't know whether that

1    declaration got accepted, but they certainly have a

2    website that's used to drive traffic.  That's what

3    they do.  And that's why in their own words they put

4    up a video that people are not supposed to see.

5         I mean, even the title itself, Judge, of the

6    video belies their arguments about why they put it

7    up.  It says, even for a minute watching Hulk Hogan

8    have sex on a canopy bed is not safe for work, but

9    watch it, anyway.

10        If you look through *Michaels* -- and, Judge,

11   the way they've written that opinion, they talk

12   about the copyright claim, the right to publicity

13   claim, the public disclosure claim and the intrusion

14   claim or the other right to privacy claim in

15   separate portions of the opinion.

16        I don't know anywhere in there where they say

17   that their finding rose or fell on the fact that

18   people were either charged or not charged for

19   watching the content.  Indeed, the tort of public

20   disclosure or private information only requires we

21   prove that they published it.  That's the nature of

22   the tort.  Certainly, Judge --

23        THE COURT:  Well, I raise that question

24   because it seems to me that you cannot eliminate

25   from the *Michaels* case the fact that this particular

 1      video had been copyrighted.

 2              And that's not our facts here.  Obviously, the

 3      case went on, the judge went on to discuss all of

 4      these other issues.

 5              Let's give Mr. Thomas a chance to respond.

 6              MR. TURKEL:  All right, Judge.

 7              THE COURT:  I have hearings at 4:00.

 8              MR. TURKEL:  Judge, if I may, as to that last

 9      point, I would say --

10              THE COURT:  Mr. Turkel, we're going to let

11      Mr. Thomas respond.  Thank you.

12              MR. TURKEL:  Thank you, Judge.

13              THE COURT:  I'll have to get one of those

14      podiums like the Eleventh Circuit has, these red

15      lights and yellow lights.

16              MR. THOMAS:  Some of us would still keep

17      talking, Your Honor.

18              THE COURT:  Well, some of us ask questions

19      that go well beyond the red light.  I just sat up

20      there, or down there, as the case may be.  And it's

21      kind of an interesting courtroom, for lack of a

22      better word, assistance.

23              But in any event, start right in with

24      *Michaels*.  I've read all your briefs.  In fact, I've

25      read this brief a lot of times over the last 12

1      years; most of it, anyway.

2           MR. THOMAS:  Yeah.  From some of the same

3      lawyers, Your Honor, I think.

4           Your Honor, there are two *Michaels* cases.  And

5      Mr. Turkel has told you about one but not the other

6      one.

7           THE COURT:  Well, that's the one you cited in

8      your footnote at page 11.

9           MR. THOMAS:  And I've got another one for you,

10     Your Honor.  And maybe I just missed it in

11     preparing.  *Michaels versus IMG*, 1998 Westlaw 882848

12     Central District of California in 1988.

13          THE COURT:  That's the original one.

14          MR. THOMAS:  That's the Hard Copy one, Your

15     Honor.  Hard Copy broadcast a story about *IMG's*

16     impending release of the sex tape and included

17     excerpts the tape.  Sound familiar?  Almost exactly

18     our facts.

19          Hard Copy broadcast the piece.  The plaintiffs

20     raised similar claims as they've done in the

21     previous case.  The court granted summary judgment

22     in favor of Hard Copy.

23          The court found that Hard Copy's use

24     constituted a protected use under the First

25     Amendment Copyright Act.

1          And with respect to the right of publicity and

2     invasion of privacy themes, it found that Hard

3     Copy's reporting of the sex tape and use of excerpts

4     from the tape to be newsworthy.

5          I think the distinction that Your Honor has

6     drawn is exactly the right distinction.  It is so

7     much easier in a copyright case to get an injunction

8     if you own the copyright and you come in and you

9     say, someone has stolen your videotape and you own

10    the copyright to it.  I mean, the distinction Your

11    Honor has drawn is absolutely clear.

12         Your Honor, we'll concede easily that this is

13    not Mr. Smith Goes to Washington or Citizen Kane.

14    But the reality is in 1789, if you said a woman was

15    a saucy tart, you went to jail.  If you say that

16    now, nobody knows what you mean.

17         There are evolving standards about what is

18    permissible and what is not.  And while the New York

19    Times may say that everything that's fit to print,

20    tabloid journalism in America is protected under the

21    newsworthy standard every day.

22         And Your Honor, I think, started on exactly

23    the right track, and that is where are all these

24    prior restraint cases that stop the publication

25    of -- of anything?  You know, where are they?  Is

1    *Michaels* the one case in the quiver of 200 years of

2    jurisprudence to stop the publication?

3         Your Honor, I don't think that Your Honor

4    wants to step on the slippery slope of deciding, you

5    know, what's permissible in our society and what's

6    not permissible.

7         The motto of the First Amendment is publish

8    and then punish.  Your Honor, if this case goes on

9    after this injunction hearing, will be faced with

10   lots of issues.

11        The *LeGrow* case.  Is there a right of privacy

12   with regard to the people in sex tapes?  Yes, there

13   is.  And whether this meets that standard is a

14   matter for another day.  Whether it's intrusion, I'd

15   certainly say it's not.  Your Honor made a --

16   decided in 2010 in a case called *Oppenheimer* that

17   this was not intrusion.

18        And if we look at whether it's intentional

19   infliction of emotional distress, we can deal with

20   that for the next two years in this case.  But I

21   think the important thing is whether a United States

22   district judge can stop and, essentially, the

23   reverse of a prior restraint, that is, enter a cease

24   and desist order or a takedown order in a

25   circumstance like this.

```
 1            And I really don't think it's a hard question,

 2     Your Honor.  I mean, I hear a lot about it being

 3     salacious.  I hear about the depravity of my

 4     clients.  But Your Honor will address that on

 5     motions to dismiss and motions for summary judgment.

 6     And there will be a lot of opportunity to talk about

 7     the merits of the case.

 8            But right now we're talking about the most

 9     extraordinary power this Court has.  And it has to

10     use it judicially.  And the history of our country

11     in a First Amendment context, it's not only a

12     preliminary injunction with all the four standards.

13     It's a First Amendment context in a preliminary

14     injunction standard.  And that threshold and that

15     bar is so hard to jump that it never happens.

16            We're not here about national security.  We're

17     not here about protecting the integrity of a

18     deliberation or Your Honor picking a jury or doing

19     things like that where there might be the grounds

20     for prior restraint.

21            It's just not permissible in this context.  If

22     we've done things wrong, there will be lots of

23     opportunity, as Mr. Bollea alleges, a hundred

24     million dollars worth of opportunity to say that we

25     violated multiple of his privacy rights.
```

1          But, Your Honor, right now, I think you should

2     be very disinclined to take action here and stop

3     what's already been posted.  Most injunctions, Your

4     Honor, are to preserve the status quo.  An

5     injunction here would be just the reverse.  It would

6     stop the publication and not preserve the status

7     quo.

8          Unless Your Honor has questions --

9          THE COURT:  Well, you have to concede that the

10    discussion of prior restraint usually comes with a

11    caveat that -- as I recall the language of the

12    cases, that the First Amendment protections are not

13    absolute.

14         What do the courts mean when they say that?

15    And I understand it's the exceptional case when a

16    prior restraint is appropriate.  Is that what the

17    courts are talking about?

18         MR. THOMAS:  I think it's that one in a

19    million case, Your Honor, where we're at the Port of

20    Tampa and we're at a time of war and some journalist

21    from the St. Petersburg Times, not the Tampa

22    Tribune, would want to publish a story about a

23    troopship leaving.

24         It would be a circumstance like that where

25    Your Honor could reach out and protect the lives of

1      American citizens, or protect the integrity of

2      process or somebody who was going to publish

3      something that would imperil the national security

4      of the United States of America.

5          Think about the *Pentagon Papers* case, Your

6      Honor.  First it involves a theft.  It involves a

7      theft against the United States of America where the

8      government of the United States contended that the

9      release of that material and published in the

10     Washington Post and the New York Times would imperil

11     the lives of citizens.

12         And in the face of theft and threat to

13     national security, the Supreme Court of the United

14     States said that was not enough.

15         Your Honor, I think the case --

16         THE COURT:  There weren't any privacy

17     interests involved in that.  That was just national

18     security.

19         MR. THOMAS:  Yes, Your Honor.

20         THE COURT:  I don't mean just, meaning it was

21     minimal, but --

22         MR. THOMAS:  Yes, Your Honor.  And I think

23     there is just one case, Your Honor, that we cited

24     that I'd just like to take a moment and read to you.

25     It's -- I think it's indicative of the sort of

1        context in which we exist.

2                It's a case that happens all in one day.  It's

3        called *Eric Foretich versus Lifetime Cable*, decided

4        by Judge Sporkin in the District of Columbia.  In

5        that case -- and I think I can read it to you

6        quicker than I can tell you about it.

7                THE COURT:  Give me the cite first.  Is it

8        cited?  I don't recall that case being cited.

9                MR. THOMAS:  17 Media L. Rptr. 1647.  And then

10       it's 1990 Westlaw 71961.

11               In that case, the court's order, which is two

12       paragraphs, said, upon consideration of the

13       plaintiff's application for a temporary restraining

14       order and argument of counsel appointed by the court

15       ad litem to represent the minor involved in the

16       film, the court examined portions of the film Hilary

17       in Hiding that is scheduled to be broadcast on April

18       6th, 7th, 14th and 19th by the defendants.  The

19       testimony -- and the testimony of Dr. Mary Froning.

20               And in view of the irreparable harm that would

21       be caused to the minor *Hilary Foretich* in the

22       broadcast of scenes involving her description of the

23       alleged sexual abuse were shown as planned, it is

24       ordered that the plaintiff's application is granted.

25       Defendants are restrained from airing, licensing,

1    distributing the scenes of Hilary involving the

2    minor's description of alleged sexual abuse until

3    after the court holds a preliminary injunction

4    hearing.

5         The same day, the DC Circuit with the panel of

6    Judges Mikva, Ginsburg, now on the United States

7    Supreme Court, and Sentelle issued this order.  Upon

8    consideration of the emergency petition of a writ of

9    mandamus, it is ordered that the motion is granted.

10        The district court's temporary retraining

11   order constitutes a prior restraint of the use of

12   the video footage of *Hilary Foretich*.  Since a prior

13   restraint has immediate and irreversible impact,

14   Nebraska Press Association, any prior restraints

15   bear a heavy presumption against its constitutional

16   validity, citing *King World Productions* and *United*

17   *States versus United States*, *New York Times versus*

18   *United States*.

19        Any rights -- and I think this is the critical

20   point, Your Honor -- any rights that *Hilary Foretich*

21   or *Eric Foretich* may have must, therefore, be

22   addressed in legal actions that do not require a

23   prior restraint and derogation of the First

24   Amendment.

25        Your Honor, I think if the DC Circuit is not

1    going to protect a young child where a tape

2    involving her sexual abuse context, then, certainly

3    in a situation like this, the Court should not enter

4    injunctive relief.

5         THE COURT:  All right.  Thank you.

6         Mr. Turkel, your response.

7         Well, that was enough for the reporters, I

8    guess.  Now give me your best shot.

9         MR. TURKEL:  Yeah, right.  May it please the

10   Court.

11        Judge, I want to be -- I want to address these

12   points at the inception of this rebuttal, though I

13   do want to let the Court know and Mr. Thomas know

14   that Mr. Bollea has filed an application for

15   copyrights in this.  It is pending and we are going

16   to amend to assert those claims.

17        What I don't want that to be seen is a

18   concession that that means anything under the

19   *Michaels* analysis, because I truly believe, Judge,

20   and this was the point I was trying to make at the

21   end of my primary argument --

22        THE COURT:  He's going to copyright a film

23   that he, under oath, claims he did not produce, was

24   not aware was being produced?  Is that what you're

25   telling me?

1            MR. TURKEL:  Yes, Judge.

2            THE COURT:  And that he does not own?

3            MR. TURKEL:  Judge, I haven't seen his

4    copyright application.  I know I have an amended

5    complaint here that was recently forwarded to us by

6    lead counsel.

7            But what I'm concerned about more so, Judge,

8    is if Your Honor was going to rely heavily on the

9    copyright.  Judge, the rights were transferred to

10   him.  I'm sorry.  We have filings here.  But the

11   rights were transferred to him.

12           THE COURT:  By who?

13           MR. TURKEL:  By Mr. Clem.  And, you know, as

14   humorous as that may be to Mr. Thomas --

15           THE COURT:  It's not humorous, it's just

16   curious.  It certainly --

17           MR. TURKEL:  It's in answer to Your Honor's

18   question.  And I haven't really analyzed --

19           THE COURT:  I guess the reporters went away

20   too soon.

21           MR. TURKEL:  But what I didn't want to happen,

22   Judge, was if you were going down that path, I

23   wanted the Court to know that we were going to be

24   filing and we're prepared to file it today,

25   actually.

1          But I don't think, Judge, and I think a clear

2     reading of *Michaels* does not link the copyright

3     aspects of that opinion with the right of publicity

4     aspect or the right of privacy aspect.

5          And I think Your Honor really hit the issue.

6     And, Judge, you are a hundred percent correct.  The

7     First Amendment is not absolute.  And the only

8     guidance that's been provided when it relates to the

9     private sexual conduct behind closed doors of a

10    public celebrity figure like Mr. Hogan is that that

11    is a private matter.  That is throughout.  It's

12    replete throughout all the cases.

13         THE COURT:  Well, how private is it,

14    Mr. Turkel, when I read this record and find out

15    that he's published a book about his affair in

16    intimate detail, has appeared in national media,

17    audio and video, discussing this tape?  And he

18    essentially has made his private sex life a matter

19    of public knowledge.

20         MR. TURKEL:  Judge, I think courts answered

21    that question for you in *Eastwood* and in *Michaels*.

22    To read from the *Michaels* opinion, the court notes

23    that the private matter at issue here is not the

24    fact that Lee and *Michaels* were romantically

25    involved.  Because they sought fame, *Lee* and

1       *Michaels* must tolerate some public exposure of the

2       fact of their involvement.  The fact recorded on the

3       tape, however, is not that *Lee* and *Michaels* were

4       romantically involved but, rather, the visual and

5       oral details of their sexual relations, facts which

6       are ordinarily considered private even for

7       celebrities.

8            And that is just a consistent maxim of law

9       from these celebrity cases, Judge.  I can --

10           THE COURT:  I don't think that answers my

11      question.

12           MR. TURKEL:  Well, Judge, I -- I think it does

13      in the sense that it is certainly newsworthy to

14      discuss the facts of the sexual act.  It is

15      certainly newsworthy to discuss the facts of a

16      romantic affair.

17           What *Michaels* is telling us is that that next

18      level, even celebrities don't sacrifice their rights

19      and their privacy to that level of disclosure.  And

20      so when you get to displaying the actual sexual act,

21      the visual and oral details of the act, that isn't

22      protected.  That is a clear violation.

23           THE COURT:  You can talk about it but you just

24      can't show it.

25           MR. TURKEL:  Yes, Judge, that's exactly the

1      point.

2           THE COURT:  Well, then, your criticism about

3      them having a detailed summary of what's depicted is

4      somewhat empty.

5           MR. TURKEL:  Different element of this

6      inquiry, Judge.  That really goes to their claim

7      that this is somewhat newsworthy and a matter of

8      public concern.

9           It's an interesting dichotomy in this case

10     because what they do in their vivid pornographic

11     narrative of this actually accent -- accentuates the

12     reason why they're publishing it.

13          And it's not because -- if they wanted to

14     report, for instance -- and I haven't read this Hard

15     Copy case.  And I'm going to ask the Court for a

16     right to brief the two cases that weren't in the

17     record, the Hard Copy case, because we haven't heard

18     about it till today.  And I would ask for leave to

19     do that, and we'll get you a brief tomorrow on that.

20          THE COURT:  I don't need your brief.  I'll

21     read it myself.

22          MR. TURKEL:  Okay.  I would venture a guess,

23     Judge, that what the reporting there was was of an

24     act or a reporting of the fact that *Bret Michaels*

25     and *Pamela Lee* had this sex tape.  And I guarantee

1    you that what was excerpted wasn't what was

2    excerpted here.

3         This isn't an excerpt just to entice the

4    viewer.  This is a highlight reel.  It's the most

5    prurient aspects of this 30-minute tape.  And you

6    can tell from the narrative because he walks you

7    through it, the author does.

8         And so I would venture a guess, and having not

9    read the case, I don't know, but I would venture the

10   detail's not the same and the inquiry is completely

11   different.

12        But I think the Court, Judge, and I think you

13   picked up on this when you were questioning

14   Mr. Thomas, those cases, the *Pentagon Papers* case,

15   they're all -- they're decided under different legal

16   standards.

17        THE COURT:  Well, the point he was making

18   though, Mr. Turkel, is that you start off by saying,

19   this is surreptitiously recorded and then published.

20        It doesn't matter how Gawker got the tape

21   under the Supreme Court cases, the *Pentagon Papers*

22   case being the most glaring example.  They could

23   have -- it could have been stolen and then provided

24   to Gawker.  That was the point.

25        MR. TURKEL:  Absolutely.

1          THE COURT:   The facts are different,

2     obviously.

3          MR. TURKEL:   Absolutely.   I think where Gawker

4     takes the step, takes the leap -- and I think this

5     becomes implicit by virtue of the fact that Gawker

6     actually argues the tape was being shopped yet not

7     published; okay?

8          I think Gawker takes the leap into prohibited

9     First Amendment land by publishing it.   Everybody

10    was discussing it.   They've attached all sorts of

11    articles where Hogan sex tape, you know, exists and

12    Hogan had affair with whoever.

13          And that's reportable, Judge.   And I think,

14    you know, that our argument with respect to the act

15    versus the fact is the courts draw that distinction.

16    And they did so in *Michaels*.   There's a whole

17    section on newsworthiness.

18          And it goes through the analysis.   The

19    societal -- the social value of the facts published,

20    and there's a balancing through those four or five

21    factors at headnotes 31 and 32.

22          But, Judge, on the flip side of sort of how

23    can a court do this, there's the equal concern,

24    Judge, and, that is, does the Court and is there a

25    Court that has approved the public nonconsensual

1    display of a sex videotape and surreptitiously

2    against the objection of the participant.

3         And can you find a case, just like Mr. Thomas

4    said, you know, I found the case.  And if it's too

5    much heavy reliance on *Michaels* is because they

6    analyzed the exact same torts under the exact same

7    facts with the exact same law.

8         And it does provide guidance, Judge.  And I

9    think, you know, in a very clear way answers all of

10   the Court's questions.

11        As to the sexual abuse case that Mr. Thomas

12   was discussing, and there's a similar mention of a

13   case that sounded somewhat like it in the briefs,

14   Judge, discussing the fact that horrible things have

15   happened is newsworthy.  Showing an actual video of

16   it is a different thing.

17        And I don't think -- and I haven't read that

18   case, either.  I think that may be a new one.  But I

19   don't think that they had a video of a child being

20   abused in there.  They had a video of someone

21   discussing the abuse of a child.  One newsworthy,

22   the vivid descriptive act is just not, Judge, and

23   there's no authority that says it is.

24        And you take the step, you know, of -- and I

25   find Mr. Thomas's arguments and the defense

1      arguments that, oh, you can just hash it out down

2      the road, you know, you're worth hundreds of

3      thousands of dollars to be directly, directly

4      rebutted -- or hundreds of millions of dollars of

5      claims by the analysis in two or three different

6      places in *Michaels* where they talked about it.

7           THE COURT:  Well, maybe you'd better take a

8      look at the Supreme Court discussions about that

9      very point in the context of emotional infliction,

10     emotional distress, the *Anderson* case, for example.

11     That's exactly what the Supreme Court has said.

12          The remedy a plaintiff has is an action for

13     damages if their rights have been violated.  The

14     remedy is not to prevent the publication by way of a

15     prior restraint.

16          MR. TURKEL:  And I would say, Judge, within

17     the privacy cases, as noted at headnote 21 in

18     *Michaels*, several courts have held that a

19     celebrity's property interest in his name and

20     likeness is unique and cannot be adequately

21     compensated by money damage.  And there's a string

22     cite to three cases there as well as a treatise --

23     two cases and a treatise.

24          THE COURT:  Well, this isn't a defamation

25     case.

1          MR. TURKEL:  Correct, Judge.  But that came

2     out of *Michaels*, which is a privacy case.

3          THE COURT:  Well, a lot came out of *Michaels*.

4     And I appreciate it.  I'm going to read it very

5     carefully.  But that's a district judge like myself

6     faced with an unusual circumstance in 1998,

7     different facts.  I have my own facts to deal with.

8          I'm going to take the motion under advisement.

9     I will tell you now that I'm inclined to find that

10    the relief requested would constitute a private

11    restraint.

12         But I'm certainly going to read these cases

13    carefully.  I want no more briefing.  Any request

14    for supplemental briefing will be denied in

15    accordance with the procedures outlined by my order,

16    as well as the local rules.

17         To the extent that the plaintiff seeks

18    additional relief, vis-à-vis the disclosure of how

19    Gawker got the film, I am not granting injunctive

20    relief in that manner.

21         But I appreciate the arguments.  And it's been

22    helpful and the briefing has been helpful.

23         Monday is a federal holiday, as I recall.  I

24    don't want to tell you when I will have this out.

25    But, certainly, it will be the first part of next

1       week, at the very latest.

2               Thank you, guys.

3               MR. TURKEL:  Thank you, Judge.

4               MR. THOMAS:  Thank you.

5               (Proceedings concluded at 3:55 PM.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                     C E R T I F I C A T E

3

4     STATE OF FLORIDA              )

5     COUNTY OF HILLSBOROUGH    )

6         I, Linda Starr, RPR, Official Court Reporter for

7     the United States District Court, Middle District,

8     Tampa Division,

9         DO HEREBY CERTIFY, that I was authorized to and

10    did, through use of Computer Aided Transcription,

11    report in machine shorthand the proceedings and

12    evidence in the above-styled cause, as stated in the

13    caption hereto, and that the foregoing pages,

14    numbered 1 through 46, inclusive, constitute a true

15    and correct transcription of my machine shorthand

16    report of said proceedings and evidence.

17        IN WITNESS WHEREOF, I have hereunto set my hand in

18    the City of Tampa, County of Hillsborough, State of

19    Florida, this 10th day of November 2012.

20

21

22         _____*/s/ Linda Starr*_____
           Linda Starr, RPR, Official Court Reporter
23

24

25

Harder Declaration
Exhibit C

## Certificate of Registration



This Certificate issued under the seal of the Copyright
Office in accordance with title 17, *United States Code*,
attests that registration has been made for the work
identified below. The information on this certificate has
been made a part of the Copyright Office records.

*Maria A. Pallante*

Register of Copyrights, United States of America

**Registration Number**

**PAu 3-639-502**

**Effective date of
registration:**

November 3, 2012

---

## Title

**Title of Work:** The Unauthorized Video

## Completion/ Publication

**Year of Completion:** 2006

## Author

■ **Author:** Bubba The Love Sponge Clem

**Author Created:** entire motion picture

**Work made for hire:** No

**Citizen of:** United States          **Domiciled in:** United States

## Copyright claimant

**Copyright Claimant:** Terry Gene Bollea

Wolf Rifkin Shapiro, 11400 Olympic Blvd 9th Floor, Los Angeles, CA,
90064-1582, United States

**Transfer Statement:** By written agreement

## Certification

**Name:** Bernard C Dietz

**Date:** November 3, 2012

---

Harder Declaration
Exhibit D



**amazon** Join Prime

Your Amazon.com  Today's Deals  Gift Cards  Help

Cyber Monday **Deals** Week  › Shop now
Presented by Amazon.com Rewards Visa Card

Shop by Department ▾  Search  Books ▾  america by heart  Go

Hello. **Sign in**  Your Account ▾  Join Prime ▾  0 Cart ▾  Wish List ▾

Books  Advanced Search  Browse Subjects  New Releases  Best Sellers  The New York Times® Best Sellers  Children's Books  Textbooks  Sell Your Books

**America by Heart** and over one million other books are available for **Amazon Kindle.** Learn more



Click to **LOOK INSIDE!**

See all 1 image(s)
Share your own customer images
Search inside another edition of this book

## America by Heart : Reflections on Family, Faith, and Flag [Bargain Price] [Hardcover]

Sarah Palin  (Author)

★★★★☆ (237 customer reviews) | 👍 Like (52)

List Price: ~~$25.99~~
Price: **$10.40** & eligible for FREE Super Saver Shipping on orders over $25. Details
You Save: $15.59 (60%)

**Only 12 left in stock.**
Ships from and sold by **Amazon.com**. Gift-wrap available.

**Get it Thursday, Nov. 29:** Order within **22 hrs 45 mins**, and choose One-Day Shipping at checkout. Details
**Ordering for Christmas?** To ensure delivery by December 24 choose **FREE Super Saver Shipping** at checkout. Read more about holiday shipping.

23 new from $2 29    37 used from $0 51    1 collectible from $69.99

This is a bargain book and quantities are limited. Bargain books are new but could include a small mark from the publisher and an Amazon.com price sticker identifying them as such. Details

| Formats | Amazon Price | New from | Used from |
|---|---|---|---|
| Kindle Edition | $9.99 | -- | -- |
| Hardcover, Bargain Price | $10.40 | $2.29 | $0.51 |
| Paperback, Bargain Price | $10.40 | $3.20 | $2.20 |
| Audio, CD, Bargain Price | $12.00 | $3.73 | $2.73 |
| Audible Audio Edition, Unabridged | $15.95 | or Free with Audible 30-day free trial | |

Quantity: 1

**Buy New**
☐ Yes, I want FREE Two-Day Shipping with Amazon Prime
Add to Cart
or
Sign in to turn on 1-Click ordering.


Add to Wish List
Add to Baby Registry

**Buy Used**
Used - Very Good  See details
**$4.50** & eligible for FREE Super Saver Shipping on orders over $25. De ails
Fulfilled by Amazon
Add to Cart
or
Sign in to turn on 1-Click ordering.

**More Buying Choices**
61 used & new from $0 51
Have one to sell?  Sell on Amazon





Start reading **America by Heart** on your Kindle in under a minute.
Don't have a Kindle? Get your Kindle here, or download a **FREE** Kindle Reading App.

Share 📧 f 🐦 📌

## Book Description

Release Date: **November 23, 2010**

In the fall of 2009, with the publication of her #1 national bestselling memoir, Sarah Palin had the privilege of meeting thousands of everyday Americans on her nationwide 35-city book tour. Inspired by these encounters, her new book, AMERICA BY HEART: Reflect ons on Family, Faith, and Flag, celebrates the enduring strengths and virtues that have made this country great. Framed by her strong belief in the importance of family, fa th, and patriotism, the book ranges w dely over American history, culture, and current affairs, and reflects on the key values-both national and spiritual-that have been such a profound part of Governor Palin's life and continue to inform her vision of America's future. Written in her own refreshingly candid voice, AMERICA BY HEART will include selections from classic and contemporary readings that have moved her-from the nation's founding documents to great speeches, sermons, letters, literature and poetry, biography, and even some of her favor te songs and movies. Here, too, are portraits of some of the extraordinary men and women she admires and who embody her deep love of country, her strong rootedness in fa th, and her profound love and appreciation of family. She will also draw from personal experience to amplify these timely (and timeless) themes-themes that are sure to inspire her numerous fans and readers all across the country.
--This text refers to the Kindle Edition edition.

## Special Offers and Product Promotions

- Explore more great deals on 1000's of titles in our Bargain Book store.
- **Giving this item as a gift?** If Amazon.com is the seller, we can wrap it for you for the special price of $2.99. Just choose the gift-wrap option when available at checkout, and let Amazon.com help make your holiday season hassle-free.

## Frequently Bought Together

 +  +  

Price For All Three: **$36.87**
Add all three to Cart  Add all three to Wish List
Show availability and shipping details

☑ This item: America by Heart : Reflections on Family, Fa th, and Flag by Sarah Palin  Hardcover  $10.40
☑ Going Rogue: An American Life by Sarah Palin  Hardcover  $19.13
☑ Sarah Palin's Alaska ~ Sarah Palin  DVD  $7.34

## Customers Who Viewed This Item Also Bought

Page 1 of 7


Going Rogue: An American Life
› Sarah Palin
★★★★☆ (1,369)
Paperback
$6.40


Sarah Palin's Alaska
Sarah Palin
★★★★☆ (44)
DVD
$7 34


Not Afraid of Life: My Journey So Far
› Bristol Palin
★★★☆☆ (163)
Hardcover
$10.40


Our Sarah: Made in Alaska
Chuck Heath Sr.
★★★★☆ (43)
Hardcover
$13.58


Sarah Palin: The Undefeated
Sarah Palin
★★★★☆ (75)
DVD
$4.99


Decision Points
› George W. Bush
★★★★☆ (1,195)
Hardcover
$19.02



## Editorial Reviews

Amazon.com Review

**Product Description**

**This is my America, from my heart, and by my heart. I give it now to my children and grandchildren, and to yours, so they will always know what it was like in America when people were free.**

Since the publication of her bestselling memoir, *Going Rogue*, in 2009, former Alaska governor Sarah Palin has traveled the country extensively. She has vis ted cities and towns in

almost every state. At speech-in-ormal-ty bases, given talks and speeches to small groups and at massive rallies. Throughout her travels, she has been privileged to meet thousands of Americans—ordinary men and women who have shared w th her hopes and dreams, their love of country, and their fears about what lies ahead. Governor Palin, inspired by these encounters, celebrates in her new book the enduring strengths and virtues that have made this country a beacon of liberty and hope for the rest of the world.

*America by Heart* is a highly personal testament to her deep love of country, her strong roots in fa th, and her profound appreciation of family. Ranging widely over American history, culture, and current affairs, Governor Palin reflects on the key values that have been such an essential part of her own life and that continue to inform her vision of America's future. The book also includes brief readings from classic and contemporary texts that have moved and inspired her, as well as portraits of Amer cans, both famous and obscure, whom she admires.

Informed by Palin's own principles and deepest feelings, graced with intimate memories, this remarkable book gives us a close-up view of an extraordinary woman who is not afraid to speak out and defend the American values in which she so deeply believes.

### A Look Inside *America by Heart*
Click on the images below to open larger versions.







I play with 19-month-old Trig while Bristol supports her one-year-old son, Tripp, on his toy elephant during Tripp's birthday party in our Wasilla home. (Photo © Shealah Craighead)

After an interview near the Statue of Liberty Glenn Beck and I pose for Fox News on January 13, 2010. Glenn and I share an appreciation for Lady Liberty. America's most famous symbol for freedom-loving immigrants serves as an inspiration to all: America, continue to be exceptional, hard-working, faithful, and free. (Photo © Shealah Craighead)

The Restoring Honor rally on the steps of the Lincoln Memorial on the National Mall on August 28, 2010, in Washington, D.C., drew an estimated 500,000 people. Glenn Beck headlined the peaceful patriot celebration on the anniversary of Martin Luther King Jr.'s "I Have a Dream" speech. The words King spoke 47 years earlier changed the course of civil rights in America for the better. His niece Dr. Alveda King graced us with her presence at our rally that warm Washington day. (Photo © Shealah Craighead)

### From Booklist

If Palin's first book, Going Rogue (2009), was about settling scores, this one is designed, as the subtitle implies, to show a thoughtful Sarah, albe t one strident in her beliefs. Pulling quotes from a dizzying array of Americans (Lincoln, Helen Keller, John Adams, Harriet Tubman, and even silent Calvin Cool dge), Palin wants readers to know that the U.S. is still the greatest country on earth—or would be if we could just rid ourselves of polit cians like Barack Obama who don't believe in American exceptionalism. (To make her point, she quotes Dash in the movie The Incredibles: if everyone is special, no one is.) Obama comes in for his fair share of shots, which makes this seem like the opening salvo in the 2012 campaign, but in ts entirety, it's more about Palin's observations on the culture wars, often w th a polit cal subtext. Throughout, she seems lacking in a useful kind of ammo: irony. She der des American Idol for promoting talentless kids (while her daughter, Bristol, hoofs past her shelf life on Dancing with the so-called Stars). She extols the way Mr. Smith Goes to Washington depicts a senatorial filibuster, yet her own party, during the Obama administrat on, has debased the filibuster to a point where the Senate now shuns debate and avoids legislating. She celebrates the fight for Alaskan statehood, though her husband was a member of a secessionist party. But if irony isn't Palin's strong suit, sticking to her guns is: virtually every anecdote or reflection connects somehow to the themes of love of family and/or country (or, to be more precise, Palin's view of those virtues). This book won't make any new fans for the former governor, but it probably won't add to "the haters" (Bristol's term for those who deride her dancing), either. Proponents will see her as the strong, savvy Mama Grizzly, and detractors will find her to be simplistic and, in the words she used to describe those Amer can Idol no-talents, "self-esteem enhanced." --Ilene Cooper

See all Editorial Reviews

### Product Details

**Reading level:** Ages 99 and up
**Hardcover:** 304 pages
**Publisher:** Harper (November 23, 2010)
**Language:** English
**ISBN-10:** 0062010964
**ASIN:** B0055X6WHC
**Product Dimensions:** 8.4 x 5.4 x 1.2 inches
**Shipping Weight:** 1.2 pounds (View shipping rates and pol cies)
**Average Customer Review:** ★★★☆☆ (237 customer reviews)
**Amazon Best Sellers Rank:** #221,276 in Books (See Top 100 in Books)

Did we miss any relevant features for this product? Tell us what we missed.

Would you like to update product info, give feedback on images, or tell us about a lower price?

### More About the Author

> Vis t Amazon's Sarah Palin Page



**Biography**

Sarah Palin grew up in Alaska towns, from Skagway to Wasilla to Anchorage, while her dad taught science and coached high school sports. She and her future husband, Todd Palin, graduated from Wasilla High School in 1982, and she went on to earn her college degree from the School of Journalism at the University of Idaho. Palin served two terms on the Wasilla City Council, then two terms as the city's mayor and manager, and was elected by her peers as president of the Alaska Conference of Mayors. She then chaired the Alaska Oil and Gas Conservation Commission, and the Interstate Oil and Gas Compact Commission. Palin was elected Alaska's youngest, and first female, governor, serving from 2006 to 2009. While serving her state she was tapped as Senator John McCain's running mate in 2008, becoming the first female Republican vice presidential candidate in our nation's history.

The Palins reside in Wasilla w th their five children, including a son in the U.S. Army, and one grandson. They enjoy an extended family throughout Alaska and the Lower 48.

### Customer Reviews



★★★☆☆ (237)
3.5 out of 5 stars

| | |
|---|---|
| 5 star | 129 |
| 4 star | 18 |
| 3 star | 10 |
| 2 star | 10 |
| 1 star | 70 |

" *Sarah Palin did not write this book.* "
SiggyRomberg | 22 reviewers made a similar statement

" *I hope America will take advantage of her wisdom, faith in America and leadership in these times of great needs.* "
Steve Adams | 22 reviewers made a similar statement

SchaeberleD | 11 reviewers made a similar statement

See all 237 customer reviews

### Most Helpful Customer Reviews

158 of 240 people found the following review helpful

★☆☆☆☆ **More Red Meat For Her Base, But Little Else New or Revealing** January 17, 2011

By Frederick S. Goethel VINE™ VOICE

Format: Hardcover | **Amazon Verified Purchase**

As a moderate, I have been following Palin to see if she might be a viable candidate (from my standpoint) in the elections in 2012. I have read a few books by her and her autobiography, so I have a bit to compare to. I find it a sad commentary that the books written about her paint her in a better light than she paints for herself in the books she has written about herself.

I found this book to contain little new.  t was Obama bad...Reagan great with no real analysis of what either had done. If Obama did it, or proposed it, it must be wrong with little to support her comments. The same occurred, in reverse, for Reagan. She seemed to ignore his more obvious flaws and tried to paint everything he did as great.

Throughout the book there are misstatements of fact when it suits her purpose. Some is current, while some was historical. I can't believe she didn't know that what she was writing was wrong, and if she didn't, then maybe she needs to do a little research into a subject before spouting off.

I know there are people that think she is stupid, which I believe is a dangerous mistake. On the contrary, I believe she is quite intelligent but she doesn't use her intelligence when making statements. One possibility is that she intentionally does not want to let on that she is intellectually on a par with those she labels as "elite" in order to deliberately deceive her base. Either that, or she is just intellectually lazy.

This is a book for the base (and to make some money) and should be seen as such. She doesn't reveal much new and the rhetoric is about the same as always. If you love Palin, you will love the book. If you are not a fan, you won't like this book.

85 Comments | Was this review helpful to you? Yes No

★★★★★ **One Smart Lady** November 26, 2012

By Nancy Perry

Format: Hardcover | **Amazon Verified Purchase**

I gave this book to my husband for his birthday and he really enjoyed the book. She is one tough, smart lady and very down to earth.

Comment | Was this review helpful to you? Yes No

★★★★☆ **Musings Of A Momma Grizzly** November 16, 2012

By James Gallen VINE™ VOICE

Format: Hardcover

I picked up an audio copy of "America By Heart" to listen to in the car. As I drove I listened to Sarah Palin's thoughts on the Constitution, veterans, feminism, faith, family, the challenges and joys of carrying for a special needs child, just to list a few of the topics she muses on in this book. I found myself agreeing with her often and always appreciating her point of view. This is pure Palin. Her supporters will love it and opponents will hate it. This book is easy reading, or listening, not a scholarly tome. If you are a conservative, you will enjoy it. If you are not, well, I am sorry.

Comment | Was this review helpful to you? Yes No

› **See all 237 customer reviews** (newest first)

Write a customer review

Advertisement

### Most Recent Customer Reviews

★★★★☆ **This should be read**
Sarah Palin does a fine job of explaining what is going on in the US and what can be done to right some of the problems.
Published 1 month ago by Reader-Reader

★★★★★ **You Go Girl**
What an amazing role model for all women.Conservatives like myself love her best ,but I would hope that women everywhere lay aside politics and see what it looks like to be a woman... Read more
Published 1 month ago by Debi Hernandez

★★★★★ **I LOVE Sarah Palin**
She represents everything I believe in w/a common sense balance. She gets things done instead of just make promises. Is she perfect?
Read more
Published 2 months ago by J. Harper

★☆☆☆☆ **Talk to those that know her.**
Don't read this book - save your money and go visit the people in Alaska who really know this woman. People write such nice things about themselves - dah!
Published 2 months ago by woman53

★☆☆☆☆ **phiolpandering**
I didnt read this. waiting until someone pays me to get it off their hands. Really only want it to help level a broken coffee table.
Published 4 months ago by doc

★☆☆☆☆ **Not worth the price**
You can get it at the Dollar Store now. Still not worth the price.

Really, it has nothing of value, unless you value gross misinterpretations of history and repeated... Read more
Published 4 months ago by Mom

★★★★☆ **A Book Review of Sarah Palin's "America by Heart  Reflections on...**
Sarah Palin - love her or hate her - has just released her new book entitled, "Reflections on Family, Faith and Flag". Read more
Published 5 months ago by David J. Pepe

★★★★★ **AMERICA BY HEART**
I REALLY ENJOYED READING THIS BOOK VERY MUCH. I THOUGHT THE BOOK WAS A GREAT BOOK. I REALLY WOULD RECOMMEND THIS BOOK FOR OTHER PEOPLE TO READ.
Published 6 months ago by Hogan_62

★★★★☆ **Getting to understand Sarah**
I did enjoy reading this book, though at times it was a little slow. I came away from it with a new respect for Sarah and an understanding of her deeply religious feelings and... Read more
Published 8 months ago by Macan



★★★★★ **Very Inspiring Book**

I thoroughly enjoyed this book and would recommend it to anyone who would like to read more about our history, culture and values as a nation. Read more

Published 9 months ago by Linda M Carter

**Search Customer Reviews**

[        ] Go

☑ Only search this product's reviews

## What Other Items Do Customers Buy After Viewing This Item?

 **Going Rogue: An Amer can Life**  by Sarah Palin   Paperback
★★★☆☆ (1,369)
$6.40

 **Not Afraid of Life: My Journey So Far**  by Bristol Palin   Hardcover
★★★☆☆ (163)
$10.40

 **Sarah Palin's Alaska**  – Sarah Palin   DVD
★★★★☆ (44)
$7.34

 **Our Sarah: Made in Alaska**  by Chuck Heath Sr.   Hardcover
★★★★☆ (43)
$13.58

## Forums

## Listmania!

## So You'd Like to…

## eGift This Item  (What's this?)

**Instant Delivery:** E-mail a gift card suggesting this item

**Flexible Gifting Choices:** They can choose this, or p ck from millions of other items.

 Get Started



## Look for Similar Items by Category

Books > Christian Books & Bibles > Christian Living
Books > Politics & Social Sciences > Politics & Government > Ideologies & Doctrines > Conservatism & Liberalism
Books > Politics & Social Sciences > Politics & Government > Specif c Topics > Commentary & Opinion

## Feedback

▸ If you need help or have a question for Customer Service, **contact us**.
▸ Would you like to **update product info**, **give feedback on images**, or **tell us about a lower price**?
▸ Is there any other feedback you would like to prov de? **Click here**

## Your Recent History  (What's this?)


Loading.

**Get to Know Us**
Careers
Investor Relations
Press Releases
Amazon and Our Planet

**Make Money with Us**
Sell on Amazon
Become an Affiliate
Advertise Your Products
Independently Publish with Us

**Let Us Help You**
Your Account
Shipping Rates & Policies
Amazon Prime
Returns Are Easy

Amazon Kindle Community                         See all                Manage Your Kindle
Help

## amazon.com

Canada   China   France   Germany   Italy   Japan   Spain   United Kingdom

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **AbeBooks**<br>Rare Books<br>& Textbooks | **AmazonLocal**<br>Great Local Deals<br>in Your City | **AmazonSupply**<br>Business, Industrial<br>& Scientific Supplies | **AmazonWebServices**<br>Scalable<br>Cloud Services | **AmazonWireless**<br>Cellphones &<br>Wireless Plans | **Askville**<br>Community<br>Answers | **Audible**<br>Download<br>Audio Books | **BeautyBar.com**<br>Prestige Beauty<br>Delivered | **Book Depository**<br>Books With Free<br>Delivery Worldwide |
| **CreateSpace**<br>Indie Publishing<br>Made Easy | **Diapers.com**<br>Everything<br>But The Baby | **DPReview**<br>Digital<br>Photography | **Fabric**<br>Sewing, Quilting<br>& Knitting | **IMDb**<br>Movies, TV<br>& Celebrities | **Junglee.com**<br>Shop Online<br>in India | **MYHABIT**<br>Private Fashion<br>Designer Sales | **Shopbop**<br>Designer<br>Fashion Brands | **Soap.com**<br>Health, Beauty &<br>Home Essentials |
| **Wag.com**<br>Everything<br>For Your Pet | **Warehouse Deals**<br>Open-Box<br>Discounts | **Woot**<br>Never Gonna<br>Give You Up | **Yoyo.com**<br>A Happy Place<br>To Shop For Toys | **Zappos**<br>Shoes &<br>Clothing | **Vine.com**<br>Everything<br>to Live Life Green | **Casa.com**<br>Kitchen, Storage<br>& Everything Home | | |

Conditions of Use   Privacy Notice   Interest-Based Ads   © 1996-2012, Amazon.com, Inc. or its affiliates