UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

TERRY GENE BOLLEA professionally
known as HULK HOGAN

      Plaintiff,

                                   Case No.: 8:12-cv-02348-JDW-TBM

vs.

GAWKER MEDIA, LLC aka GAWKER
MEDIA, *et al.*

      Defendants.

_____/

### DEFENDANT GAWKER MEDIA, LLC'S OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION TO ENJOIN COPYRIGHT INFRINGEMENT

Apparently, plaintiff hopes the *fourth* time is a charm. With a TRO application and two prior injunction motions behind him (Dkt. 4, 5, 54), he once again seeks a prior restraint on an unflattering report and commentary, this time based on a newly-minted claim for copyright infringement (Dkt. 60). As defendant Gawker Media, LLC ("Gawker")[1] demonstrates below, however, plaintiff still cannot establish he is entitled to preliminary relief, because his motion is premised on a series of assertions that are just flat out wrong under governing law:

*First*, plaintiff does not even attempt to show irreparable injury, contending that such harm is *presumed* upon showing a likelihood of success on his copyright infringement claim. But that assertion is no longer good law in light of the Supreme Court's decision in *eBay Inc. v.*

---

[1] Defendant Gawker submits this response as the only party publishing the Excerpts at issue. To the extent that defendants Denton, Daulerio and Bennert are for any reason deemed publishers who could be enjoined, they join in this motion. Defendants Gawker Media Group, Inc., Gawker Entertainment, LLC, Gawker Technology, LLC, and Gawker Sales, LLC (the "Tag-Along Defendants") have challenged both this Court's jurisdiction over them and plaintiff's failure to allege any wrongful conduct by them, including as is relevant here, posting of content whose publication could be enjoined. *See* Mot. to Dismiss (Dkt. 63) at 20-24. Defendant Blogwire Hungary Szellemi Alkotast Hasznosito KFT was never served. *Id.* at 1 n.1. In any event, any effort to enjoin any of these other entities from continuing to display the Excerpts at issue would fail for the same reasons as set forth herein.

*MercExchange, L.L.C.*, 547 U.S. 388 (2006), and its progeny.  Moreover, he could not make the requisite showing in any event, because copyright law protects property interests, not the privacy interest he once again seeks to enforce, albeit dressed here in different garb.  *See* Part I *infra*.

*Second*, plaintiff contends that, because he is seeking an injunction based on alleged copyright infringement, which is protected by the Constitution's Copyright Clause, the First Amendment has no place in the analysis.  But in *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1263-65, 1277 (11th Cir. 2001), the Eleventh Circuit emphasized that significant "First Amendment protections [are] interwoven into copyright law," including, as is relevant here, in the fair use analysis and in a general presumption *against* entering a "prior restraint on speech," where a defendant has "a viable fair use defense."  *See* Part II *infra*.

*Third*, on the merits, plaintiff cannot show ownership of a valid copyright because the original Video was indisputably recorded by a stationary surveillance camera and involved no creative expression, with Bubba the Love Sponge, from whom plaintiff claims to have acquired the copyright, having publicly disclaimed any role in its creation.  *See* Part III.A.1 *infra*.

*Fourth*, in arguing infringement and trying to negate a finding of fair use, plaintiff relies heavily on *Michaels v. Internet Entertainment Group, Inc.*, 5 F. Supp. 2d 823 (C.D. Cal. 1998) ("*Michaels I*"), but he fails to address – *or even mention* – a later opinion in that case, *Michaels v. Internet Entertainment Group, Inc.*, 1998 WL 882848 (C.D. Cal. Sep. 11, 1998) ("*Michaels II*").  This Court previously concluded that *Michaels II* is "more analogous" to these facts, *see Bollea v. Gawker Media, LLC*, 2012 WL 5509624, at *3 n.5 (M.D. Fla. Nov. 14, 2012), and *Michaels II* found that using brief excerpts of a similar sex tape in connection with news and commentary qualified as a fair use, 1998 WL 882848, at *14.  *See* Part III.A.2 *infra*.

*Finally*, the other relief plaintiff seeks – *e.g.*, imposition of a constructive trust and waiver of the bond requirement, *see* PI Mem. at 18, Ex. 3 (Proposed Order) ¶¶ 2-4 – is equally unsupportable.  *See Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 333 (1999) (court may not impose constructive trust to secure possible future money damages);  Fed. R. Civ. P. 65(c) (imposing bond requirement).  *See* Part IV *infra*.  At bottom, plaintiff's latest motion for injunctive relief is fundamentally flawed and should be denied.

## BACKGROUND

### A.    Factual Background

Although plaintiff's allegations are no doubt well known to the Court, defendants briefly summarize them here.  This lawsuit arises out of a story published in early October on the Gawker website (the "Gawker Story").  First Amended Complaint ("FAC") (Dkt. 42) ¶ 27.  The Gawker Story includes brief excerpts (the "Excerpts") – lasting a total of 101 seconds – from a longer video (the "Video") that depicts plaintiff having "consensual sexual relations" with Heather Clem, the then-wife of plaintiff's friend "Bubba the Love Sponge aka Todd Alan Clem," Bollea Decl. (Dkt. 4-1) ¶ 6, with his friend's blessing.  The Video was recorded approximately six years ago at the Clems' home, *id.*, while plaintiff was still married.

The Excerpts begin with Bubba the Love Sponge encouraging his wife and plaintiff to have sex, telling them, "I'll be in my office if you need me."[2]  They also depict plaintiff receiving a phone call and deciding not to take it, and principally depict conversations between plaintiff and Mrs. Clem in which plaintiff stated *inter alia*:  that he should instead be at home; that he had been working out; that he just ate, felt "like a pig" and was out of breath; and that his son's girlfriend's twin sister had proposed a liaison with plaintiff.  Noting that the Video

---

[2] *See* http://gawker.com/5948770/even-for-a-minute-watching-hulk-hogan-have-sex-in-a-canopy-bed-is-not-safe-for-work-but-watch-it-anyway.

had been "circulated last April" and the subject of prior reports on numerous celebrity news websites, the Gawker Story's text – in a manner consistent with the Excerpts – offers a humorous description of both the sex and the conversation depicted in the Video, comments on the public's fascination with celebrities' sex lives, attempts to capture both the disappointment and satisfaction of knowing that "celebrity sex" is often ordinary, and repeatedly notes that the Video appears to be depicting plaintiff's affair with his best friend's wife with his best friend's blessing – a fact later confirmed by plaintiff. *See* Wong Decl. (Dkt. 60 -2) Ex. A.

In all, the Excerpts total one minute and 41 seconds, out of a Video that plaintiff concedes runs for approximately 30 minutes, *see* PI Mem. at 17, and include fewer than 10 seconds of sexual activity.  The grainy black-and-white Video appears to have been recorded by a single stationary surveillance camera, not operated by anyone, including Mr. Clem who was in his office.  Following the publication of the Gawker Story, Mr. Clem confirmed in a radio interview that the Video was recorded by the security cameras that are mounted throughout his home.  He also confirmed that he never personally retrieved the recording from the "master hard drive" where the security footage is automatically stored, had no idea who did so, did not prepare the Video for dissemination, and had in fact "never seen the tape."[3]

As set forth in greater detail in Defendant Gawker Media, LLC's Opposition to Plaintiff's [First] Motion for Preliminary Injunction (Dkt. 28) ("Gawker First PI Opp."), the Video had been the subject of widespread news coverage prior to Gawker's post, including graphic description of its contents and posting of images from it.  *See* Fugate Decl. (Dkt. 29) Exs. 3-15. Widespread public interest in and discussion of Hogan's sexual encounter has continued since.

---

[3] *See* http://www.youtube.com/watch?v=2wQ4ZZVmgE8 at 4:35-5:19, 10:51-11:00, 11:21-12:04, 12:18-12:29, 37:00-37:22.  *See also id.* at 11:21-12:04 (adding that that no one could think he prepared the Video because it allegedly features him bragging to his wife that they could make money off of the recording and, if he had prepared it, he "would have been smart enough to edit" himself out so he "do[es]n't look stupid").

*See* Gawker First PI Opp. at 4 and nn.10-14; Fugate Decl. Exs. 17-24.  Both before and after the

Gawker Story was published, plaintiff himself participated in that public conversation, *id.* Ex. 14

– as he had in connection with an earlier extramarital affair described in his biography, *see id.*

Exs. 2, 14 – and repeatedly submitted the Gawker Story on the Court's public docket.  *See, e.g.*,

Dkt. 4-1, Ex. D at 8-11; Dkt. 54-2, Exs. A-D (four copies); Dkt. 60-2, Ex. A.

## B.   <u>Procedural Background</u>

On October 15, 2012, eleven days after the Gawker Story was published, plaintiff

commenced this action (Dkt. 1), asserting various common law torts.  The following day,

plaintiff filed motions for a TRO (Dkt. 4) and a preliminary injunction (Dkt. 5) seeking

substantially the same relief plaintiff seeks here, both of which were denied by the Court (Dkt.

8, 47).  At the hearing on plaintiff's (first) preliminary injunction motion, plaintiff's counsel

advised that he planned to file an amended complaint also asserting a claim for copyright

infringement.  *See* Dkt. 45 (transcript) at 35-37.  In its order denying that motion, the Court

noted the filing of that new claim, and expressly relied on *Michaels II*'s "analogous" rejection

of claims under both "privacy and copyright law" where video excerpts had been the subject of

a news report.  *Bollea*, 2012 WL 5509624, at *2 n.2 & *3 n.5.  After noticing an appeal of that

ruling (Dkt. 49), plaintiff filed a Motion for Injunction Pending Appeal (Dkt. 54), seeking the

identical relief yet again, which this Court denied for the same reasons (Dkt. 61).

Even though the Clems did not play any role in creating the Video, which was recorded

by a stationary surveillance camera, on October 26, 2012, Mr. Clem entered into an agreement

with plaintiff – as part of a settlement of plaintiff's lawsuit against him – under which he

purportedly transferred his supposed copyright in the Video to plaintiff.  Harder Decl. Ex. A.

Plaintiff further contends that he obtained a registration of his copyright in the Video, "with an

effective date of" November 3, 2012.  *Id.* Ex. C.  On November 8, 2012, plaintiff filed his First

Amended Complaint, adding the copyright infringement claim but failing to plead the

circumstances under which he obtained that copyright or to attach a copyright registration.  *See*

FAC ¶¶ 78-86.  Defendants have moved to dismiss his amended complaint in its entirety for

failure to state a claim (and for lack of jurisdiction over the Tag-Along Defendants, *see* note 1

*supra*), including to dismiss the copyright infringement claim for failing to plead ownership,

registration, or an entitlement to statutory damages or attorneys' fees (Dkt. 63).  Despite these

deficiencies, plaintiff filed this present motion on November 30, 2012, seeking the same relief

plaintiff sought in his three prior motions, this time based on his purported copyright.

## ARGUMENT[4]

## I.   FAILURE TO DEMONSTRATE IRREPARABLE HARM IS FATAL TO PLAINTIFF'S MOTION.

### A.   Plaintiff's Assertion that Irreparable Harm is Presumed is Wrong.

Plaintiff concedes that irreparable injury is a fundamental prerequisite for obtaining a

preliminary injunction.  *See* PI Mem. 8 (citing authorities); *see also Siegel v. LePore*, 234 F.3d

1163, 1176 (11th Cir. 2000) ("A showing of irreparable injury is the sin qua non of injunctive

relief").  Yet, plaintiff contends that he need not make that showing here because irreparable

harm may be *presumed* in a copyright action if a plaintiff demonstrates a likelihood of success on

the merits.  *See* PI Mem. 2, 8-9, 12 (citing *Stoneworks, Inc. v. Empire Marble & Granite, Inc.*,

1998 WL 998962, at *6 (S.D. Fla. Nov. 19, 1998), *Michaels I*, 5 F. Supp. 2d at 830, and *Apple

Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1254 (3d Cir. 1983)).

---

[4] As a threshold matter, plaintiff's motion should be denied for the simple reason that the copyright claim upon which it is based is inadequately pleaded.  *See* Mot. to Dismiss (Dkt. 63) at 18-20.  The purpose of a preliminary injunction is "to preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the lawsuit's merits."  *Devose v. Herrington*, 42 F.3d 470, 471 (8th Cir. 1994); *see also Jones v. DOC*, 2007 WL 3034836, at *1 (N.D. Fla. Oct. 17, 2007) (same).  Thus, no preliminary injunction can issue where, as here, the underlying claim is not properly pleaded.  *See, e.g., Pro Image Installers, Inc. v. Dillon*, 2009 WL 112953, at *2 (N.D. Fla. Jan. 15, 2009) (denying PI motion as moot where underlying complaint was inadequately pleaded).

Plaintiff is wrong.  While such a presumption may have applied when the cases upon which he relies were decided a dozen or more years ago, those cases are no longer good law in light of the Supreme Court's subsequent decision in *eBay*.  In *eBay*, the Court held in the patent context that a presumption of irreparable injury does not follow from a finding of infringement, explaining that it also "has consistently rejected invitations to replace traditional equitable considerations with a rule that an injunction automatically follows a determination that a copyright has been infringed."  547 U.S. at 392-93 (citing cases).  *See also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (reaffirming that in all cases "plaintiffs seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction")  (emphasis added).  Indeed, even before *eBay*, "the Supreme Court ha[d] made clear that there is no presumption of irreparable injury when the alleged infringer has a bona fide fair-use defense."  *Suntrust Bank*, 268 F.3d at 1276 (citation omitted).

In light of *eBay*, the Eleventh Circuit has concluded that an injunction "does not automatically issue upon a finding of copyright infringement."  *Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enter., Int'l*, 533 F.3d 1287, 1323 (11th Cir. 2008).[5]  Other courts of appeal have reached the same conclusion, including, as relevant to the *Michaels I* decision on which plaintiff so heavily relies, the Ninth Circuit.  *See, e.g.*, *Flava Works v. Gunter*, 689 F.3d 754,755 (7th Cir. 2012); *Flexible Lifeline Sys., Inc. v. Precision Lift, Inc.*, 654 F.3d 989, 998 (9th Cir. 2011); *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 F. App'x 351, 354-55 (4th Cir. 2011); *Salinger v. Colting*, 607 F.3d 68, 79-80 (2d Cir. 2010).  Thus, after *eBay*, courts

---

[5] That *eBay* and *Peter Letterese* involved requests for permanent injunctions rather than, as here, for a preliminary injunction, is of no significance.  As the Supreme Court has explained, "[t]he standard for a preliminary injunction is essentially the same as for a permanent injunction" except that the "plaintiff must show a likelihood of success on the merits rather than actual success."  *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987).  Thus, "no obvious distinction exists between permanent and preliminary injunctive relief to suggest that *eBay* should not apply to the latter."  *N. Am. Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008).

deciding whether to issue injunctions to protect a copyright "must not simply presume irreparable harm.  Rather, [copyright] plaintiffs must show, on the facts of their case, that failure to issue an injunction would actually cause irreparable harm."  *Live the Life Ministries, Inc. v. The Pairs Found., Inc.*, 2011 WL 6780997, at *12 (N.D. Fla. Sep. 27, 2011) (citation omitted).

In this case, plaintiff has not even attempted to make that showing based on his erroneous contention that irreparable harm may simply be presumed.  That failure, on an element on which he indisputably bears the burden, is fatal to his motion and it should be denied for that reason alone.  *See ACLU of Fla. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (because a "preliminary injunction is an extraordinary and drastic remedy," plaintiff's "[f]ailure to show any of the four [preliminary injunction] factors is fatal.").

### B.      Plaintiff Cannot Show Irreparable Injury in the Copyright Sense.

Even had plaintiff addressed the issue of irreparable injury as required, he would not have been able to make the requisite showing.  The only purportedly irreparable harms plaintiff has attempted to identify are injuries to his public image and to his privacy interests.  *See* Dkt. 5 at 8; Dkt. 54 at 14-15; *see also* FAC ¶¶ 2, 38, 45.  As the Second Circuit explained, "the justification of the copyright law is the protection of the *commercial* interests of the artist/author.  It is not to coddle artistic vanity or to protect secrecy, but to stimulate creation by protecting its rewards."  *Salinger*, 607 F.3d at 81 n.9 (quoting *New Era Publ'ns, ApS v. Henry Holt & Co.*, 695 F. Supp. 1493, 1526 (S.D.N.Y. 1988)) (emphasis in original); *see also id.* at 81 (a copyright plaintiff's "interest is, principally, a property interest in the copyrighted material").  Accordingly, insofar as plaintiff's interest is in protecting his privacy, rather than in reaping a market benefit from his publication of the Video, his interest is not one that copyright law protects.  *See Bond v. Blum*, 317 F.3d 385, 396 (4th Cir. 2003) ("[T]he protection of privacy is not a function of the copyright law.  To the contrary, the copyright office offers a limited monopoly to encourage ultimate

8

public access to the creative work of the author.  If privacy is the essence of [plaintiff's] claim, then his action must lie in some common-law right to privacy, not in the Copyright Act.").  *See also Suntrust Bank*, 268 F.3d at 1282 (Marcus, J., concurring) (goal of copyright law "'focus[es] on the right of the individual to reap the reward of his endeavors and ha[s] little to do with protecting feelings or reputation'") (citation omitted).[6]

## II.    THE FIRST AMENDMENT EFFECTIVELY BARS THE RELIEF PLAINTIFF SEEKS.

Plaintiff contends that, because he is invoking copyright law, the prior restraint he seeks "does not offend the protection of the First Amendment," PI Mem. at 8; *see also id.* at 2, 3, 5, 6, 8.  But, in *Suntrust Bank*, the Eleventh Circuit flatly rejected that view, holding that the district court's order enjoining publication of a parody of *Gone With the Wind* "was at odds with the shared principles of the First Amendment and the copyright law, acting as a prior restraint on speech."  268 F.3d at 1277.  As the Court of Appeals explained, "[t]he Copyright Clause and the First Amendment, while intuitively in conflict, were drafted to work together to prevent censorship."  *Id.* at 1263.  Because copyright laws enable "speakers to make money from speaking and thus encourages them to enter the public marketplace of ideas," they were "enacted in part to prevent private censorship" while "the First Amendment was enacted to prevent public censorship."  *Id.* at 1263 & n.13; *see also id.* at 1283 (Marcus, J., concurring) (copyright law

---

[6] That plaintiff acquired his copyright interest after the alleged infringement had begun negates any contention of future irreparable injury to that property interest.  As a matter of basic logic, plaintiff cannot claim he is suffering irreparable injury because his property continues to be in the same condition he knew it to be in when he acquired it.  *Cf. College Entrance Exam Bd. v. Cuomo*, 788 F. Supp. 134, 145 (N.D.N.Y. 1992) (plaintiff could not show irreparable harm needed to obtain preliminary injunction where it had previously acquiesced in infringement and, therefore, any harm plaintiff might suffer during pendency of litigation would be identical to that plaintiff had already knowingly endured).  If the injury to that property interest were truly irreparable, the easiest way to avoid that purported harm was simply not to acquire the copyright in the first place.  Moreover, although it makes no difference for purposes of a motion seeking prospective injunctive relief, plaintiff did not acquire claims of past infringement, Harder Decl. Ex. A, and thus cannot sue for any alleged infringements preceding the transfer.  *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 944 F.2d 971, 980 (2d Cir. 1991) ("[A] copyright owner can assign its copyright but, if the accrued causes of action are not expressly included in the assignment, the assignee will not be able to prosecute them.").

should not be read as conferring on copyright holders "a power of indirect censorship").  As such, the First Amendment limits the relief plaintiff seeks in several respects.

First, courts "must remain cognizant of the First Amendment protections interwoven into copyright law," particularly "through the doctrine of fair use." *Id.* at 1264-65.  Where, as here, an alleged infringement constitutes a news report and commentary on a matter of interest to the public, the First Amendment necessarily animates the fair use doctrine.  *See, e.g.*, *id.* at 1264 (fair use includes "criticism, comment, [and] news reporting" and the "exceptions carved out for these purposes are at the heart of fair use's protection of the First Amendment").  *See* Part III.A.2 *infra*.

Second, the First Amendment also significantly curtails the availability of preliminary injunctive relief in copyright cases like this one.  As the Court of Appeals has explained, "[w]hile injunctive relief may be particularly appropriate in cases involving simple copying or 'piracy' of a copyrighted work, the Supreme Court has cautioned that such relief may not be consistent with the goals of copyright law in cases where the alleged infringer has a colorable fair-use defense." *Id.* at 1265 (citations omitted).[7]  As a result, both the Supreme Court and lower courts have expressed deep concern about issuing preliminary injunctions restraining speech outside the context of clear-cut cases of piracy.  *See, e.g.*, *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578 n.10 (1994) ("Because the fair use enquiry often requires close questions of judgment as to the extent of permissible borrowing . . ., courts may wish to bear in mind that the goals of the

---

[7] In this regard, plaintiff wrenches out of context undersigned counsel's statement that injunctive relief is often easier to obtain in the copyright context, PI Mem. at 5, 8, when the entire statement clearly referred to facts, like those in *Michaels I*, where "someone has stolen your videotape" and is selling pirated copies.  Dkt. 45 at 28. Indeed, in the immediately preceding discussion, undersigned counsel made clear that, in circumstances analogous to those here, the court in *Michaels II* had found video excerpts a "protected use under the First Amendment [and the] Copyright Act." *Id.* at 27.  Consistent with this distinction, it bears noting that many of the authorities on which plaintiff relies involved relatively straightforward cases of piracy or copying, where, unlike here, the defendant lacked an even colorable fair use defense.  *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829 (11th Cir. 1990) (PI Mem. at 7-8) (piracy of satellite television programing); *Apple Computer*, 714 F.2d at 1254 (PI Mem. at 9) ("wholesale copying" of computer software); *Stoneworks*, 1998 WL 998962, at *3 (PI Mem. at 2, 9) ("laser copy" of catalog).

copyright law . . . are not always served by automatically granting injunctive relief [even] when [defendants] are found to have gone beyond fair use."); *Religious Tech. Ctr. v. Lerma*, 897 F. Supp. 260, 267 (E.D. Va. 1995) (denying request for preliminary injunction based on claim of copyright infringement to allow newspaper defendant "to report on the news").[8]  For this reason, plaintiff's request for an order requiring Gawker to remove the Excerpts from its website should be denied.

## III.   PLAINTIFF CANNOT SATISFY HIS BURDEN OF PROVING HIS ENTITLEMENT TO A PRELIMINARY INJUNCTION.

### A.   Plaintiff is Unlikely to Prevail on the Merits of His Claims.

#### 1.   There is No Valid Copyright in the Video.

As an initial matter, plaintiff cannot succeed on the merits of his copyright infringement claim because he does not own a valid copyright in the Video.  While plaintiff is correct that the copyright registration certificate he has attached to his motion is "prima facie proof of the existence of a valid copyright," *see* PI Mem. at 10 (citing 17 U.S.C. § 410(c)), that "presumption is rebuttable," *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1541 n.20 (11th Cir. 1996).  Here, there is no basis for concluding that Bubba the Love Sponge ever held a valid copyright in the Video that he could then transfer to plaintiff.

First, while the Certificate of Registration identifies "Bubba the Love Sponge Clem" as the "author" of the Video, *see* Harder Decl. Ex. C, he has publically disclaimed any role in its creation.  Specifically, he stated that, although the Video appears to have been recorded on his home surveillance system, he never personally retrieved the recording from the "master hard

---

[8] Plaintiff contends that the First Amendment and the Copyright Act protects the "freedom *not* to speak." PI Mem. at 8 (citation omitted).  However, he cites no authority for the proposition that a plaintiff may use the Copyright Act, not to restrict his own creative work from being disseminated, but to censor work created by someone else (or as here by a fixed surveillance camera involving no creative expression whatsoever) to protect his public persona, to shield himself from embarrassment, and to prevent criticism and commentary.

drive" where all the security footage is automatically stored, did not prepare the Video for dissemination, does not know who did, and has never seen it.  *See* note 3 *supra*.

Second, even if Mr. Clem had not specifically denied authorship in the Video, the manner in which the video was created, *i.e.*, being captured surreptitiously by a stationary wall-mounted security camera, means that it is not properly subject to copyright protection.  The Supreme Court has explained that, to be susceptible of copyright, a work must be "original" by reflecting "at least some minimal degree of creativity." *Fiest Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345 (1991).  While "the requisite level of creativity is extremely low," *id.*, the standard nonetheless excludes works where the process by which the work was created was "so mechanical . . . as to require no creativity whatsoever," *id.* at 362.  *See also id.* at 359 (noting that, even under low threshold for creativity, "[t]here remains a narrow category of works in which the creative spark is utterly lacking or so trivial as to be virtually nonexistent").  Here, the Video, which, by every account, was recorded by a purely mechanical process, with no input from a human author, lacks even the minimal requisite degree of creativity to render it susceptible of copyright protection.  *See, e.g.*, *Atari Games Corp. v. Nintendo of Am., Inc.*, 1993 WL 214886, at *5 (N.D. Cal. Apr. 15, 1993) (numbers randomly generated by computer program not copyrightable); *see also* Copyright Office, COMPENDIUM II OF COPYRIGHT OFFICE PRACTICES § 503.03(a) ("In order to be entitled to copyright registration, a work must be the product of human authorship.  Works produced by mechanical processes . . . without any contribution by a human author are not registrable."); S. Rep. No. 94-473, at 53 (1975) (Senate Report to Copyright Act of 1976) (copyright protection of recordings does not extend to "cases in which sounds are fixed by some purely mechanical means without originality of any kind"); H.R. Rep. 94-1476, at 55 (1975) (House Report to Copyright Act of 1976) (same).

12

2. **Gawker's Use is a Fair Use.**

Even if the Video can be the subject of copyright, Gawker's use is a fair use.
Incorporating First Amendment principles, *see* Part II *supra*, the Copyright Act expressly
provides that "the fair use of a copyrighted work . . . for purposes such as criticism, comment,
[or] news reporting, . . . is not an infringement of copyright."  17 U.S.C. § 107.  The statute
specifies four factors to take into account to determine whether a particular use is fair:  (i) the
purpose and character of the use; (ii) the nature of the copyrighted work; (iii) the amount and
substantiality of the portion used; and (iv) the effect of the use on the market for the original.  *Id.*
The four factors, taken together, demonstrate that Gawker is making fair use of any protectable
elements in the Video and that an injunction is not warranted.

The authorities on which plaintiff exclusively relies in disputing this conclusion –
*Michaels I* and *HarperCollins Publishers, LLC v. Gawker Media LLC*, 721 F. Supp. 2d 303
(S.D.N.Y. 2010) – both involved quite different circumstances, as set forth in greater detail
below, and, thus, in no way compel the same result here.  *See Campbell*, 510 U.S. at 577 (fair use
requires "case-by-case analysis").  Indeed, this Court has already concluded that *Michaels I* is
not an appropriate analogue for these facts.  *See Bollea*, 2012 WL 5509624, at *3 n.5.

a. **Purpose and Character of the Use**:  The first factor in the fair use inquiry is "the
purpose and character of the use, including whether such use is of a commercial nature or is for
nonprofit educational purposes."  17 U.S.C. § 107(1).  This factor cuts decisively in Gawker's
favor.  As this Court noted in its ruling denying plaintiff's first preliminary injunction motion,
Gawker posted the Video excerpts specifically "in conjunction with *the news reporting
function*," *Bollea*, 2012 WL 5509624, at *3 (emphasis added), which is one of the examples of
fair use expressly enumerated in the statute.  *See* 17 U.S.C. § 107.  Plaintiff contends that,

13

because the Gawker Story was posted alongside paid advertisements, the use must be characterized as "commercial."  *See* PI Mem. at 15 (citing *HarperCollins*, 721 F. Supp. 2d at 306).  But this Court has already rejected this argument, explaining that, while "[i]t is true that Defendants stand to indirectly profit from the posting of the Video excerpts, to the extent it drives additional traffic to Defendants' website," that "is distinguishable from ***selling*** access to the Video solely for the purpose of commercial gain."  *Bollea*, 2012 WL 5509624, at *3 n.7 (emphasis in original); *see also Campbell*, 510 U.S. at 584 (noting that "news reporting" is "generally conducted for profit in this country") (citation omitted).

Moreover, the primary focus of the first factor is "whether the new work merely 'supersede[s] the objects of the original creation or instead adds something new,'" and is therefore transformative.  *Campbell*, 510 U.S. at 579 (citation omitted).  Here, Gawker is using the Excerpts for a different purpose than the original Video, *i.e.*, to report and comment upon a controversy occasioned by the existence of the Video, and the affair depicted on it, a use that the Court in *Michaels II* recognized as transformative under nearly identical facts.  *See Michaels II*, 1998 WL 882848, at *12 (use was transformative where excerpts of sex tape were used as part of news reporting, unconnected to sale of full tape).  In this context, "[i]t is this transformation of the works into news – and not the mere newsworthiness of the works themselves – that weighs in favor of fair use under the first factor of § 107."  *Núñez v. Caribbean Int'l News Corp.*, 235 F.3d 18, 23 (1st Cir. 2001) (newspaper's reprinting of lurid photographs of then-reigning Miss Puerto Rico was fair use because photographs were used to report on scandal about the photographs).  Here, as in *Michaels II* and *Núñez*, the allegedly protected work itself *is* news.  In other words, Gawker is not using the Excerpts merely to illustrate an unrelated story, as would be the case, for instance, if Gawker were using a generic copyrighted video of the plaintiff, such as wrestling

highlights.  Rather, the Video itself is integral to the story, which strongly supports a finding of fair use for using brief Excerpts from it.  *See, e.g.*, *Núñez*, 235 F.3d at 23 ("by using the photographs in conjunction with editorial commentary" about them, newspaper used the works for "'a further purpose'" giving them a new "'meaning or message'") (quoting *Campbell*, 510 U.S. at 579).  In addition, Gawker's extensive editing of the Video, reducing it from 30 minutes to less than two minutes and doing so in a manner designed to comment on celebrity sex and the public's fascination with it, further illustrates the transformative nature of the use.  *See, e.g.*, *Los Angeles News Serv. v. CBS*, 305 F.3d 924, 939 (9th Cir. 2002) (editing of raw video footage into montage was transformative), *amended at* 313 F.3d 1093 (9th Cir. 2002); *Fuentes v. Mega Media Holdings, Inc.*, 2011 WL 2601356, at *10 (S.D. Fla. June 9, 2011) (editing and re-contextualizing raw footage was transformative).[9]

      **b.**     **Nature of the Copyrighted Work**:  The second factor, the nature of the copyrighted work, also cuts in favor of finding fair use.  As the Supreme Court has emphasized, fair use is much more likely to be found when the underlying work is primarily factual, rather than creative, in nature.  *See Campbell*, 510 U.S. at 586.  Here, the Video, which merely captures an unscripted sexual encounter, is plainly factual in nature.  *See, e.g.*, *Los Angeles News Service*, 305 F.3d at 940 (raw footage of infamous beating during Los Angeles riots was primarily "informational and factual"); *Fuentes*, 2011 WL 2601356, at *14 (raw video footage of Cuban activities in Angola was "factual . . . as a matter of law," as it involved "no more than the

---

[9] The transformative nature of the use at issue here serves to distinguish this case from *Michaels I* and *HarperCollins*.  In *Michaels I*, the ultimate purpose of defendant's use was to sell the sex tape itself, not to comment on the tape or those depicted in the tape.  *See Michaels I*, 5 F. Supp. at 834 (describing commercial subscription service).  In *HarperCollins*, the Court determined that "defendant essentially engaged in no commentary or discussion," 721 F. Supp. 2d at 306, which is not the case here.  Moreover, a crucial element of the commentary in the Gawker Story – the use of the allegedly copyrighted materials to question plaintiff's carefully orchestrated public persona – was missing in *HarperCollins*.  The excerpts from the Sarah Palin book there at issue were not accompanied by such commentary and were to be imminently released by her publisher in the same form.

minimum authorial decision-making necessary to make a work copyrightable").  This is especially so given that the Video was taken from a single stationary surveillance camera that appears to have been simply mounted on the wall.  *See id.* at *15 ("In viewing [the copyrighted video], a reasonable fact-finder could clearly see that there is little to no 'expressive content' of the work; there is only what seemingly amounts to [plaintiff's] decision to turn the camera on or turn the camera off.").

Moreover, while plaintiff correctly notes that the Video is unpublished, *see* PI Mem. 15, that carries significantly less weight in circumstances like these where the copyright owner has no intention to market the work.  The analysis in *Michaels II* on this issue is exactly on point: "Here, Lee has stated that her intended use for the Tape was to destroy it.  It cannot be said therefore that Paramount 'scooped' Lee's intended first publication . . . .  The unpublished nature of the work therefore plays a minimal role in determining whether the fair use defense applies." 1998 WL 882848, at *12; *see also Online Policy Group v. Diebold, Inc.*, 337 F. Supp. 2d 1195, 1203 n.13 (N.D. Cal. 2004) (where plaintiff had no intention to publish protected works, their status as unpublished did "not obviate application of the fair use doctrine").[10]

c.      **Amount and Substantiality of the Use**:  The third factor, the amount and substantiality of the use, also favors finding fair use.  On this issue, plaintiff asserts that, even though Gawker used only a small portion of the Video, its use was nonetheless substantial because Gawker "edited the most graphic parts of the Video in a one-minute 'highlight reel.'"  PI Mem. at 17.  But that is a rather dramatic mischaracterization of the Excerpts.  They include

---

[10] This is perhaps the most salient difference between this case and *HarperCollins*.  In *HarperCollins*, the publication of excerpts from Sarah Palin's forthcoming book threatened to undercut plaintiff's plan for releasing and marketing the complete work.  *See HarperCollins*, 721 F. Supp. 2d at 306-07 (stating that "unpublished" nature of the work "substantially weaken[s] defendant's fair use claim" because "plaintiff is in the home stretch of a carefully orchestrated promotional campaign for a book that . . . was to be released in only a few days.").  Here, no such danger exists.

fewer than ten seconds of explicit sexual activity, with the rest comprised of some of the more banal and less "sexy" aspects of the encounter.  Thus, both the relatively small amount of sexually explicit footage used and its lack of centrality to the Video as a whole support a finding of fair use.  *See Michaels II*, 1998 WL 882848, at *13 (use was not substantial where it consisted of only brief excerpts from celebrity sex tape that were "not sufficiently explicit to constitute exploitation of the value of the Tape in a manner that conflicted with the owners' rights").

      **d.**      **Effect on the Market**:  Finally, the last statutory factor, effect on the market, also favors a finding of fair use.  Indeed, plaintiff says next to nothing about this factor, *see* PI Mem. at 17, even though the Supreme Court has characterized it as the most important consideration in the fair use analysis.  *See Harper & Row Publishers, Inc. v. Nation Enters.*, 471 U.S. 539, 566 (1985).  While plaintiff has not expressed any intention to market the Video, were he to do so, it would almost certainly be to sell copies of the full tape as pornography, much the way Internet Entertainment Group did in *Michaels I*.  But Gawker is using the Excerpts for the decidedly different purpose of reporting and commentary, and, toward that end, has specifically selected Excerpts from the Video that for the most part do not depict sex.  Accordingly, the Gawker Story is not usurping plaintiff's potential market for the Video.  *See Michaels II*, 1998 WL 882848, at *14 ("[Defendant's] transformative use of the Tape excerpts to produce an entertainment news story does not affect Lee's market for the same service, because Lee is not in such a market."); *see also Los Angeles News Service*, 305 F.3d at 942 (factor weighed in favor of fair use where defendant's use of portions of copyrighted work was "in a significantly different market" than original use); *Núñez*, 235 F.3d at 25 (same).  This, again, is in stark contrast to *Michaels I*, where the defendant planned to release the exact same product as the original in the exact same market, and thus was potentially "saturating the . . . market for the plaintiffs' copyrighted work."  5 F.

Supp. 2d at 836.  Because the Excerpts are a fair use, plaintiff cannot show a likelihood of success on the merits for this reason as well.

### B.      Plaintiff Cannot Demonstrate Irreparable Harm.

As demonstrated in Part I *supra*, plaintiff is required to establish irreparable injury, has not attempted to do so, and could not do so in any event.

### C.      The Balance of the Harms Favors Gawker.

The third step in the analysis calls for the Court to balance the risk of irreparable harm to the plaintiff against the risk of harm to the defendant.  Here, the harm Gawker stands to suffer if the injunction is granted is plain.  As this Court noted in its ruling on plaintiff's first preliminary injunction motion, "[t]he Supreme Court has repeatedly recognized that even minimal interference with the First Amendment freedom of the press causes an irreparable injury." *Bollea*, 2012 WL 5509624, at *4 (citing cases); *see also Lerma*, 897 F. Supp. at 262 (stating, in case in which plaintiff sought to enjoin newspaper's use of material on copyright grounds, that "[t]he harm to the [newspaper] defendants if the plaintiff's motion if granted is self-evident").  Plaintiff's blithe assertion that Gawker "will not suffer any harm if an injunction is granted," PI Mem. at 12, simply ignores those well-established interests.

### D.      The Public Interest Weighs Against Granting a Preliminary Injunction.

Finally, the public interest weighs against issuing an injunction.  As the Court of Appeals noted in *Suntrust Bank*, "the public interest is *always* served in promoting First Amendment values and in preserving the public domain from encroachment."  268 F.3d at 1276 (emphasis added); *see also Lerma*, 897 F. Supp. at 267 ("The public interest lies with the unfettered ability of the [defendant] to report on the news.")  Accordingly, the public interest lies with Gawker's continued ability to publish the Gawker Story and the brief Excerpts accompanying it.

18

## IV.   PLAINTIFF IS NOT ENTITLED TO THE OTHER RELIEF HE SEEKS.

Finally, plaintiff is not entitled to any of the additional relief he seeks.  Plaintiff asks the Court to require Gawker to provide all copies of the Video to plaintiff, *see* Proposed Order (Dkt. 60-3) ¶ 2, but that relief is improper in the context of a preliminary injunction, the purpose of which is confined to preserving the status quo pending resolution of the dispute.  *See Habersham Plantation Corp. v. Country Concepts*, 1980 WL 1161, at *2 (N.D. Ga. Apr. 14, 1980) (impoundment of allegedly infringing materials was not warranted at preliminary injunction stage).  Next, plaintiff requests that a "constructive trust" be placed on all of defendants' revenues and profits associated with the challenged publication, Proposed Order ¶ 3, but this Court has already concluded that it cannot issue such relief under governing Supreme Court authority.  *See Bollea*, 2012 WL 5509624, at *5 n.9 ("a district court may not issue a preliminary injunction preventing a defendant from disposing of assets in support of a claim for money damages") (citing *Grupo Mexicano*, 527 U.S. at 333).  Lastly, plaintiff's request that he be relieved from the requirement to post a bond, Proposed Order ¶ 4, has no support in the law. Federal Rule of Civil Procedure 65(c) mandates that security be posted in connection with preliminary injunctive relief, and nothing in the copyright context alters that requirement.  *See Live the Life Ministries*, 2011 WL 6780997, at *14 (noting bond requirement in case in which a preliminary injunction was granted based on copyright infringement).  Accordingly, if for any reason his request for an injunction is granted, plaintiff must be required to post meaningful security.

## CONCLUSION

For the foregoing reasons, the Motion should be denied in its entirety.

Respectfully submitted,

THOMAS & LOCICERO PL

By:   /s/ Gregg D. Thomas
    Gregg D. Thomas
    Florida Bar No.: 223913
    Rachel E. Fugate
    Florida Bar No.: 0144029
400 North Ashley Drive, Suite 1100
P.O. Box 2602 (33601)
Tampa, FL 33602
Telephone: (813) 984-3060
Facsimile: (813) 984-3070
gthomas@tlolawfirm.com
rfugate@tlolawfirm.com

Seth D. Berlin (admitted *pro hac vice*)
Paul J. Safier (admitted *pro hac vice*)
LEVINE SULLIVAN KOCH & SCHULZ, LLP
1899 L Street, NW, Suite 200
Washington, DC 20036
Telephone: (202) 508-1122
Facsimile: (202) 861-9888
sberlin@lskslaw.com
psafier@lskslaw.com

Of Counsel:
Cameron A. Stracher
Gawker Media
210 Elizabeth Street, 4th Floor
New York, NY 10012
Telephone:  (212) 743-6513
cameron@gawker.com

*Counsel for Defendant*
*Gawker Media LLC*

20

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 14th day of December 2012, a true and correct copy of

the foregoing is being electronically filed and will be furnished via CM/ECF to:

Kenneth G. Turkel, Esq.
kturkel@BajoCuva.com
Christina K. Ramirez, Esq.
cramirez@BajoCuva.com
Bajo Cuva Cohen & Turkel, P.A.
100 N. Tampa Street, Suite 1900
Tampa, FL 33602
Tel: (813) 443-2199
Fax: (813) 443-2193

Charles J. Harder, Esq.
charder@wrslawyers.com
Jonathan H. Waller, Esq.
jwaller@wrslawyers.com
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard, 9th Floor
Los Angeles, CA 90064-1582
Tel: (310) 478-4100
Fax: (310) 479-1422

David R. Houston, Esq.
dhouston@houstonatlaw.com
432 Court Street
Reno, NV 89501
Tel: (775) 786-4188
Fax: (775) 786-5091

and served by mail and email on:

Eric Levinrad, Esq.
elevinrad@wrslawyers.com
Wolf, Rifkin, Shapiro, Schulman & Rabkin, LLP
11400 W. Olympic Boulevard, 9th Floor
Los Angeles, CA 90064-1582
Tel: (310) 478-4100
Fax: (310) 479-1422

*Attorneys for Plaintiff*

                                        /s/ Gregg D. Thomas
                                        Attorney